J. Doe 1 v Trustees of Columbia Univ. in the City of N.Y. (2026 NY Slip Op 26034)

[*1]

J. Doe 1 v Trustees of Columbia Univ. in the City of N.Y.

2026 NY Slip Op 26034

Decided on February 27, 2026

Supreme Court, New York County

Lebovits, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on February 27, 2026
Supreme Court, New York County

J. Doe 1, J. Doe 2, J. Doe 3, J. Doe 4, J. Doe 5, J. Doe 6, J. Doe 7, J. Does 8, J. Doe 9, J. Doe 10, J. Doe 11, J. Doe 12, J. Doe 13, J. Doe 14, J. Doe 15, J. Doe 16, J. Doe 17, J. Doe 18, J. Doe 19, J. Doe 20, J. Doe 21, and J. Doe 22, Petitioners,

againstThe Trustees of Columbia University in the City of New York, Respondent.

Index No. 158414/2025

Forchilli Law PLLC, New York, NY (Cheryl E. Forchilli of counsel), and The Aboushi Law Firm PLLC, New York, NY (Tahanie A. Aboushi of counsel), for petitioners.Pillsbury Winthrop Shaw Pittman LLP, New York, NY (Rolando T. Acosta and Dante W. Apuzzo of counsel), Hecker Fink LLP, New York, NY (Gabrielle E. Tenzer and Maximillian L. Feldman), and Los Angeles, CA (Matthew J. Craig of counsel), and Levin & Associates, PLLC, Brooklyn, NY (Duncan P. Levin of counsel), for respondent.

Gerald Lebovits, J.

On the evening of April 29, 2024, Hamilton Hall, on the campus of Columbia University, was open to students as usual. What happened next was anything but usual.[FN1]

Hamilton Hall officially closed for the night—and its exterior doors were locked—at midnight. At least two individuals hid within the building while it was being closed. They lay in wait until everyone, except a lobby security guard and two overnight janitors, had left. At 12:30 a.m. on April 30, the two individuals who had waited opened Hamilton's front doors from the inside. With the doors open, another 40 to 50 people entered from just outside the building, quickly enough (and in such numbers) that the lobby guard could not stop them. The participants who opened Hamilton's doors, and most of the participants who entered, were wearing masks to disguise their identity.
Once let into the building, the participants spread out through Hamilton Hall, covered interior security cameras, and set up barricades. Participants had brought with them extensive construction tools, which they used to block entry into the building. They smashed the glass panes of doors leading into the building with hammers, and then bike-locked the doors closed. They blocked building stairwells by piling them with large numbers of classroom chairs. They pushed vending machines and other furniture in front of basement entrances to the rest of the building. And they dismantled interior doors to use in barricades. The end result of the occupiers' efforts was to block all entry into, and exit from, Hamilton Hall. The occupiers hung banners on the outside of the building, proclaiming "Intifada" and "Student Intifada."
After entering the building, the occupiers encountered the overnight janitors, and briefly [*2]detained them before permitting them to leave. The janitors have alleged in a federal lawsuit that before being allowed to leave, they were assaulted and taunted by some of the occupiers as being "Jew-lovers" and "work[ing] for the Jews."[FN2]
The janitors later took a long leave of absence from their jobs due to the effects of their experiences.
A day-long standoff ensued between the Hamilton Hall occupiers and the university. On the evening of April 30, 22 hours after the occupation began, officers from the New York City Police Department entered Hamilton at the request of Columbia's then-President, ended the occupation, and cleared the building.
The individuals occupying Hamilton Hall were arrested and arraigned on misdemeanor trespass charges in Criminal Court. In June 2024, those charges were dismissed by the court on the motion of the Manhattan District Attorney's Office—according to the District Attorney's Office, in part due to a lack of evidence, and in part on the understanding that Columbia would be bringing its own disciplinary proceedings against the occupiers who were affiliated with the university. Upon dismissal, the records of the occupiers' arrests and prosecutions were immediately sealed under longstanding provisions of New York's Criminal Procedure Law.
In August 2024, Columbia brought disciplinary charges against 22 Hamilton occupiers affiliated with the university (current and former students), alleging that those individuals had violated 11 of Columbia's Rules of University Conduct. Before the records of the occupiers' arrests and prosecutions were sealed, the NYPD had informed Columbia of the identities of the occupiers arrested in Hamilton (both Columbia-affiliated individuals and outsiders). In the disciplinary proceedings against the 22 Columbia students, the sole evidence that they were present in Hamilton Hall during its occupation was a report reflecting that petitioners had been arrested; Columbia's Department of Public Safety had prepared that report pre-sealing, based on information provided by the NYPD. No evidence was offered in the disciplinary proceedings of actions taken inside Hamilton Hall by any particular student, as opposed to the conduct of the group of occupiers as a whole.
Notwithstanding these evidentiary difficulties, the internal hearing panel conducting the disciplinary proceedings under the Rules of University Conduct held that the 22 Columbia students had each committed eight of the charged eleven violations of the Rules. Based on those violation determinations, the panel imposed disciplinary sanctions that ranged from suspensions to expulsions to retroactive degree revocations. The hearing panel's violation determinations and accompanying sanctions were affirmed on internal administrative appeal; and the university president denied discretionary review.
These 22 students have now brought the current CPLR article 78 proceeding against respondent, the Trustees of Columbia University, to challenge the disciplinary determinations and sanctions rendered against them.
In challenging the disciplinary actions against them, petitioners have invoked a decades-long tradition of Columbia students occupying Hamilton Hall, and other university facilities, in protest against war and injustice occurring both in Morningside Heights and around the world. [*3]Petitioners contend in this proceeding that they are being punished for having joined this tradition to oppose Columbia's asserted complicity in what they say is a genocide in Gaza. Some might agree with this contention. Others might see the occupiers' actions as manifestations of an ugly hatred against Jews, using rhetoric about Gaza merely as a pretext. But the task for this court is not to decide between these perspectives, or to opine on the moral or political issues implicated by the actions of the parties to this proceeding. This court must instead answer only a different and far narrower question—whether the disciplinary determinations and sanctions rendered by respondent against petitioners were legally sound within the meaning of CPLR 7803. And that is what this court has done.
Although narrow, the legal question before the court is still complex. This court's consideration of that question (and the subsidiary issues it presents) has been facilitated by the parties' extensive, able submissions and presentation of hours of oral argument over three days. Ultimately, this court concludes that the underlying disciplinary determinations were not impermissibly delayed. But respondent's internal hearing panel was statutorily barred from taking into account the fact that petitioners had been arrested in Hamilton Hall. And the fact of petitioners' sealed arrests was the only evidence before the hearing panel that petitioners were in Hamilton Hall while it was occupied. As a result, the panel's determinations that petitioners committed most of the charged disciplinary violations (as affirmed on administrative appeal) are arbitrary and capricious under CPLR 7803 (3). In the alternative, even assuming that the fact of petitioners' arrests was admissible before the hearing panel, the evidence before the panel still did not show by a preponderance that petitioners committed disciplinary violations other than being in Hamilton Hall during the 22 hours it was occupied.
This court therefore denies respondent's motion to dismiss, and grants petitioners' article 78 petition to the extent of vacating the challenged disciplinary determinations and sanctions and remanding to respondent for further proceedings.BACKGROUNDI. The Challenged Disciplinary Proceedings
A. The Structure and Functioning of the Disciplinary Proceedings
The disciplinary determinations (and sanctions) that petitioners challenge in this proceeding were rendered pursuant to the then-applicable Rules of University Conduct.[FN3]
These Rules were passed by "the [Columbia] University Senate for approval and acceptance by the Trustees in accordance with the Statutes of the University." (NYSCEF No. 568 at 18 [Rule 452 [c]].) They "apply to any demonstration, including a rally or picketing, that takes place on or at a University facility or at any University sponsored activity."[FN4]
(Id. at 5 [Rule 442].)
The Rules enumerate forms of conduct that constitute disciplinary violations of the Rules. (See id. at 6 [Rule 443].) Complaints of Rules violations may be made by members of the university community to the Rules Administrator. (See id. at 11 [Rule 447].) The Rules Administrator is appointed by the university's President after consultation with the Executive Committee of the University Senate. (See id. at 8 [Rule 445].) The Administrator is responsible for investigating complaints of Rules violations (and reporting the findings of that investigation), for bringing disciplinary charges based on alleged Rules violations, and for presenting evidence to support those charges before hearing panels. (See id.)
Charges of Rules violations are heard before the University Judicial Board (UJB). (See id.) The UJB comprises five members (plus alternates), appointed by the Executive Committee of the University Senate to staggered three-year terms. Those five must include at least one student, at least one faculty member, and at least one non-faculty staff member. (See id.)
When disciplinary charges are brought, both the Rules Administrator and the individual facing the charges (the respondent) may submit written statements to the UJB. If the UJB determines, upon reviewing the Rules Administrator's investigation report and the parties' written statements, that an oral hearing is necessary to determine whether a violation has occurred, the UJB will schedule a hearing on reasonable advance notice. (See id. at 13 [Rule 448].) At the hearing, both the Rules Administrator and the accused respondent may make opening and closing statements; and the panel of UJB members will question them (and any witness who testifies). (See id. at 13-14.) The parties may not directly question each other, but they may propose questions for the panel to ask. (See id. at 14.)
Following the hearing, the UJB hearing panel will determine whether the Rules Administrator has shown by a preponderance of the evidence that the respondent committed the charged violations; and the hearing panel will give the parties a written explanation of that determination. (See id. at 14-15.) If the hearing panel determines that a violation has occurred, the UJB will then determine the appropriate sanction (as defined in the Rules). (See id. at 15-16 [Rule 449].)
UJB violation determinations and sanctions may be appealed to the university's Appeals Board by either the Rules Administrator or the respondent. (See id. at 17 [Rule 450].) The Appeals Board comprises three members, each a university dean, appointed by the Executive Committee of the University Senate to staggered three-year terms. (Id. at 8 [Rule 445].) The grounds for appeals to the Appeals Board are limited to (i) a procedural error affecting the determination or sanction; (ii) new, previously unavailable information that might change the determination or sanction; or (iii) excessiveness of the sanction. (See id. at 17 [Rule 450].) A party wishing to challenge a decision of the Appeals Board may seek discretionary review from the university President. (See id.)
B. The Disciplinary Proceedings Brought Against Petitioners
The occupation of Hamilton Hall ended on April 30, 2024. As alleged in the petition, petitioners, along with many others, were arrested that night by the NYPD and were arraigned in New York City Criminal Court on misdemeanor trespass charges under Penal Law 140.10. (See [*4]NYSCEF No. 559 at ¶ 49 [amended petition with redactions].) On April 30 or May 1, the NYPD provided a list of the individuals it had arrested in Hamilton Hall to respondent-university's Department of Public Safety, which the Department used on May 1 to prepare a "Public Safety Offense/Incident Report" about the Hamilton Hall occupation. (See id. at ¶ 50; NYSCEF No. 574 [redacted version of the incident report].)[FN5]

Also on May 1, respondent's Center for Student Success and Intervention (CSSI) contacted petitioners to inform them that charges would be brought against them under CSSI's Standards and Discipline policy—a different, less-formal rules procedure from the Rules of University Conduct. (See id. at ¶ 53 [amended petition with redactions]; see also NYSCEF No. 570 [copy of the Standards and Discipline policy].)
In early June 2024, respondent transferred the allegations against petitioners to the disciplinary process governed by the Rules of University Conduct. (See id. at ¶ 57.) The Rules Administrator investigated the complaints against petitioners in June and July 2024. (See id. at ¶¶ 58-59.) In late June 2024, while this investigation was ongoing, the Manhattan District Attorney's Office moved to dismiss the Criminal Court charges against petitioners under Criminal Procedure Law (CPL) 170.40, and the motion was granted. (See id. at ¶ 52; NYSCEF No. 17 [certificate of disposition, filed under seal].) The District Attorney's Office stated publicly that one of the reasons it sought dismissal of all the charges was a lack of evidence about the conduct of the occupiers in Hamilton Hall, due in part to their having worn masks and blocked security cameras. (See NYSCEF No. 559 at ¶ 52 & n 13.) The District Attorney's Office also told respondent that dismissal of the charges was "based, in part, on the Office's understanding that the students would be subject to Columbia's internal disciplinary proceedings." (NYSCEF No. 575 [letter memorializing those conversations, sent from the District Attorney's Office to an attorney in respondent's office of general counsel].)
Upon dismissal of the charges against petitioners, the records of their arrests and prosecutions were sealed by operation of law under CPL 160.50 (1). (Id.) The District Attorney's Office did not move in Criminal Court to leave unsealed the records of the arrests and prosecutions of petitioners (as it could have done under that subsection of CPL 160.50. Nor did respondent ask the District Attorney's Office to make that motion.[FN6]
(See NYSCEF No. 612 at Tr. 6-7 [transcript of Dec. 9, 2025, argument].)
In August 2024, the Rules Administrator brought disciplinary charges against petitioners, alleging that they each violated the same 11 Rules of University Conduct. (See NYSCEF No. 559 at ¶¶ 61-62.) The list of charges attached a copy of the Rules Administrator's investigation report. (See id. at ¶ 64; NYSCEF No. 309 [investigation report with redactions].)
The UJB held hearings in each petitioner's disciplinary proceeding in January and [*5]February 2025.[FN7]
(See NYSCEF No. 559 at ¶ 68.) In March 2025, the UJB issued (identical) written determinations in each petitioner's proceeding, finding that petitioners had all committed eight of the eleven violations charged. (See id. at ¶ 73, 78; see also NYSCEF No. 318 [representative copy of the UJB determination, with redactions].) The UJB's determination stated that a necessary finding supporting that determination—that each petitioner had been present in Hamilton Hall during the occupation—was based on the Department of Public Safety incident report, compiled using arrest-related information from the NYPD. (See NYSCEF No. 318 at 3.)[FN8]
Based on these determinations, the UJB imposed disciplinary determinations against petitioners. Some of the petitioners received lengthy suspensions; several were expelled; and others had degrees revoked retroactively. (See NYSCEF No. 559 at ¶¶ 81-83.)
Petitioners timely appealed the UJB's determinations and sanctions to respondent's Appeals Board. In those appeals, petitioners argued, among other things, that the UJB erred in considering the incident report. That report, petitioners contended, was inadmissible because it was based on arrest records that had been sealed under CPL 160.50 before the UJB disciplinary proceedings began. (See NYSCEF No. 320 at 2 [copy of Appeals Board decision discussing this argument].) In April 2025, the Appeals Board affirmed in full the UJB's determinations in petitioners' disciplinary proceedings. (See e.g. NYSCEF No. 320 [Appeals Board decision on J. Doe 1's administrative appeal, with redactions].) In those decisions, the Appeals Board specifically rejected petitioners' arguments that the UJB panel committed a procedural error by "consider[ing] certain public safety records"—i.e., the incident report—"for purposes of identification." (Id. at 5 [pdf pagination].)
Columbia's President then declined petitioners' requests to grant discretionary review of the decisions of the UJB and the Appeals Board. (See e.g. NYSCEF No. 321 [President's letter declining review in J. Doe 1's proceeding].)
II. This CPLR Article 78 Proceeding
Petitioners timely filed this CPLR article 78 proceeding on July 7, 2025, to challenge the UJB's disciplinary determinations and sanctions, as affirmed by the Appeals Board.[FN9]
(See [*6]NYSCEF No. 297 [redacted version of petition]; NYSCEF No. 559 [redacted version of amended petition].)
This proceeding was initially commenced under seal, pursuant to an interim sealing order. (See NYSCEF No. 298 at 2-3 [redacted interim sealing order].) Respondent did not oppose petitioners' underlying sealing motion. This court determined, without objection, that the appropriate course was to permit petitioners to prosecute this proceeding under a pseudonymous caption.[FN10]
This court also limited sealing to some of the filings in the proceeding (while redacting others), rather than seal the entire docket. (See NYSCEF No. 616 [anonymized version of sealing decision].) Unsealed (and minimally redacted) transcripts of the oral arguments in the proceeding have been filed on the docket.
Also on July 7, petitioners brought on by order to show cause a motion for judgment in their favor on the petition (mot seq 002), with an accompanying request for an interim stay of respondent's disciplinary sanctions pending the resolution of the court proceeding. (See NYSCEF No. 7.) This court held a lengthy oral argument on July 17, 2025, on petitioners' stay request. (See NYSCEF No. 290 [oral argument transcript].) This court signed the proposed order to show cause but denied the requested interim stay. (See NYSCEF No. 617 [anonymized version of interim-stay order].)
On August 8, 2025, respondent moved to dismiss the petition (mot seq 003). (See NYSCEF No. 268.) This court heard oral arguments on motion sequences 002 and 003 on November 13, 2025, and December 9, 2025. (See NYSCEF Nos. 585, 612 [oral argument transcripts].) In January 2026, the parties, with the court's permission, submitted supplemental post-argument letter briefs, with accompanying exhibits. (See NYSCEF Nos. 592, 609, 611 [letter briefs]; see generally NYSCEF No. 592-611.) The motions are now ready for decision.

DISCUSSION
As an initial matter, this court must determine whether it may resolve these motions at all. One of petitioners' arguments in this proceeding is that respondent's disciplinary determinations must be annulled because, assertedly, they were inadequately supported by the evidence introduced at each petitioner's disciplinary hearing. (See NYSCEF No. 310 at 25-29.) This sufficiency argument, in turn, raises the question whether the petition is asserting a CPLR 7803 (4) substantial-evidence challenge that must be transferred to the Appellate Division, First Department, under CPLR 7804 (g). The parties oppose transfer. This court agrees that transfer is not required.
A determination by a body or officer may be subject to review for substantial evidence—and therefore subject to transfer to the Appellate Division—only when the determination at issue was "made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law." (CPLR 7803 [4] [emphasis added].) "Direction by law," for these purposes, encompasses "hearings required either by constitutional due process" or by "statute and accompanying regulations." (Matter of Bevaqua v Sobol, 176 AD2d 1, 3 [3d Dept 1992].) The parties do not identify a statute or regulation that mandates hearings in private-university disciplinary proceedings like those at issue here. And the First Department has expressly held that a Columbia University student's "'due process' challenge" to an adverse disciplinary determination was "misplaced" because a "student at a private university," like Columbia, is not "afforded the 'full panoply' of due process rights."[FN11]
(Matter of Bondalapati v Columbia Univ., 170 AD3d 489, 490 [1st Dept 2019], quoting Matter of Mu Ch. of Delta Kappa Epsilon v Colgate Univ., 176 AD2d 11, 13 [3d Dept 1992].)
The quasi-judicial hearings that respondent conducted as part of petitioners' disciplinary proceedings were not held pursuant to direction by law within the meaning of CPLR article 78. Petitioners' challenge to the sufficiency of the evidence supporting respondent's disciplinary determinations does not, therefore, entail transfer of this proceeding to the First Department. The proceeding must instead remain in Supreme Court, Civil Term, for this court to determine on its merits.
This court resolves the merits of the petition (and respondent's motion to dismiss the petition) as follows.
Point I of the Discussion addresses petitioners' argument that the underlying disciplinary determinations are arbitrary and capricious because those determinations (and the UJB disciplinary proceedings more broadly) were unduly delayed in violation of the Rules of University Conduct. This court concludes that the length of time that elapsed before the UJB rendered its determinations did not render those determinations arbitrary and capricious.
Point II considers petitioners' argument that the disciplinary determinations were arbitrary and capricious because those determinations rested on petitioners' sealed arrests. This court agrees with petitioners that the UJB's disciplinary determinations (as affirmed by respondent's Appeals Board) are arbitrary and capricious. A necessary element of those determinations—petitioners' presence in Hamilton Hall during its occupation—was established only through inadmissible evidence: Information reflecting the fact of petitioners' sealed arrests [*7]by the NYPD in Hamilton. Absent that inadmissible evidence, the UJB's conclusion that the charged violations had been established by a preponderance (and the Appeals Board's affirmance of that conclusion) necessarily lacked foundation in the record.
Point III addresses petitioners' alternative argument that the disciplinary determinations were arbitrary and capricious because they lacked evidentiary support even assuming that the fact of petitioners' arrests was admissible. This court holds, in the alternative, even if the fact of petitioners' arrests were admissible, the record before the UJB still does not contain evidence about the actions taken by each petitioner, in particular, while they were occupying Hamilton Hall. As a result, several of the violation determinations—those requiring a showing of conduct beyond petitioners' being present in Hamilton during the occupation—would still not be rationally supported by the evidence before the UJB.
Point IV discusses the appropriate disposition of the motions given the court's conclusions in Points I through III. This court holds that because all—or at a minimum some—of the UJB's violation determinations were arbitrary and capricious due to a lack of supporting evidence, the sanctions the UJB imposed based on those violation determinations (and affirmed by the Appeals Board) cannot stand, either. This court therefore does not reach petitioners' arguments that those sanctions were arbitrary and capricious because they were excessive and violated the First Amendment.
This court does not rule out the possibility that respondent could prove that petitioners violated applicable university rules. The court therefore declines petitioners' request not only to annul the challenged determinations, but also to bar recommencement of disciplinary proceedings against them. Instead, this court vacates the challenged determinations and sanctions and remands to respondent for further proceedings consistent with this decision.
Respondent's motion to dismiss the article 78 petition (mot seq 002) is denied. Petitioners' motion for judgment in their favor on the petition (mot seq 003) is granted only to the extent set forth above.
I. The Challenge to Delay in Conducting and Resolving Petitioners' Disciplinary Proceedings
Petitioners argue that the challenged disciplinary determinations must be annulled as arbitrary and capricious because respondent did not conduct and resolve the underlying disciplinary proceedings within the timeframes set by Columbia's Rules of University Conduct. (See NYSCEF No. 310 at 21-25, citing Matter of Powers v St. John's Univ. Sch. of Law, 25 NY3d 210, 216 [2015].) This court disagrees.
Rule 446 of the Rules of University Conduct, entitled "Rights of the Respondent," provides for several forms of procedural protections for respondents in disciplinary proceedings brought under the Rules. Petitioners rely on the "Time Frame" section of Rule 446. That section begins by stating that the "University will seek to resolve every report of misconduct within approximately two (2) months of an incident, not counting any appeal," and that "[g]enerally the time line will be as follows. . . ." (Id. at 10.) Rule 446 then lays out a detailed timeline for investigating, hearing, and resolving disciplinary complaints. (See id.) It is undisputed that the length of time required for the disciplinary proceedings to conclude far exceeded the periods of time set out in Rule 446. The question is whether those delays rendered the ultimate determination arbitrary and capricious. This court concludes that they did not.
As an initial matter, as respondent points out (see NYSCEF No. 566 at 17-18), the deadlines set out in the "Time Frame" section are not as mandatory, as petitioners contend. Rather, as reflected in the language quoted above, Rule 446 provides that Columbia University will seek to resolve every misconduct complaint within the allotted timeframe, and that each stage of the proceeding will generally be completed by the Rule's applicable intermediate deadlines. (See NYSCEF No. 568 at 10.) This is not to say that the deadlines are purely hortatory and aspirational. Petitioners correctly note, for example, that the Rule provides that the "hearing panel may extend any time frame for good cause, with a written explanation to the Rules Administrator and respondent" (id. at 11)—thereby suggesting that the proceedings generally must meet each deadline.[FN12]
But the aspirational character of the introductory language in this section of Rule 446 undercuts an argument that exceeding the specified timeframes is, standing alone, a fatal procedural defect.
This court also finds persuasive respondent's contention that the length of time involved stemmed from the unusual and logistically challenging circumstances in which these 22 disciplinary proceedings occurred, along with many others during the same time period. (See NYSCEF No. 566 at 18-19.)
Additionally, the caselaw does not support petitioners' position that delays of this kind, without more, warrant annulling disciplinary determinations.
Petitioners rely on the trial-court decision in Matter of Ryan v Hofstra University (67 Misc 2d 651 [Sup Ct, Nassau County 1971]), annulling disciplinary action against a college student based on, among other things, undue delay. (See NYSCEF No. 310 at 24.) But a crucial element of the delay-related holding in Matter of Ryan was that the delay in conducting a disciplinary review in petitioner's case occurred after petitioner had been sanctioned based on an initial determination against him. (See 67 Misc 2d at 656-657, 660-662.) For this reason, "the delay in fixing a review date effectively fixed a significant minimum punishment unaffected by potentially successful appeal." (Id. at 661.) Respondent here did not impose any comparable interim punishment for the occupation of Hamilton Hall.[FN13]

The ruling in Matter of Machosky v State Univ. of NY at Oswego (145 Misc 2d 210 [Sup Ct, Oswego County 1989]), also cited by petitioners, does not support annulling the challenged determinations, either. The Matter of Machosky court found delay-related prejudice because (i) respondent had imposed an interim suspension; and (ii) the delay prevented petitioner from calling material witnesses at the disciplinary hearing. (See 145 Misc 2d at 215-216.) Additionally, a witness who was unavailable at the hearing as a result of the delay had previously given a written statement that respondent "used to great advantage" against petitioner at the hearing. (Id. at 215.) Neither form of delay-related prejudice exists in the proceedings now at issue. (Cf. Matter of McGill v Columbia College, 1996 WL 34573243 [Sup Ct, NY County Sept. 18, 1996] [distinguishing Matter of Machosky's delay-related holding on the ground that there, "the delay was found to have greatly prejudiced the student in violation of the requirement of fundamental fairness, in that key witnesses were not present at the hearing as the result of the delay."].)
Petitioners also rely on Matter of Waldman v United Talmudical Academy (147 Misc 2d 529 [Sup Ct, Orange County 1990]). (See NYSCEF No. 310 at 24.) But Matter of Waldman did not involve delays in an ongoing disciplinary proceeding. That case concerned the expulsion of petitioners' children in March 1990 from the religious school they were attending. The motion court held that the expulsion was arbitrary and capricious because the triggering event for that action (petitioner's expulsion from the associated synagogue congregation) had occurred in October 1989, with no explanation given for the six-month delay in imposing the collateral educational expulsion. (See 147 Misc 2d at 531-532.) Even then, the relief the court granted was limited to "annulling the children's expulsion pending the current school year" to give them time to finish the spring semester and find another school for the fall. The court did not annul the expulsion altogether, as petitioners now request. (Id. at 533.)
The extended duration of the disciplinary proceedings did not render the ultimate determinations in those proceedings arbitrary and capricious.
II. The Challenge to Admission of Sealed Arrest Information
Next, petitioners argue that the disciplinary determinations against them were arbitrary and capricious, because (petitioners say) those determinations rested on evidence that CPL 160.50 and 160.60 rendered inadmissible in the proceedings before the UJB. Strictly speaking, this argument goes to the sufficiency of the evidence supporting the challenged disciplinary determinations.[FN14]
But the question of the admissibility of this evidence raises several threshold [*8]legal questions distinct from the remainder of petitioners' sufficiency-related challenges. This court therefore considers first the admissibility of the sealed arrest information.
A. The Nature of the Statutory Inquiry Required to Evaluate Petitioners' Admissibility Challenge
CPL 160.50 (1) provides that upon favorable termination of a criminal action or proceeding, as defined in § 160.50 (3), the record of the action or proceeding shall be sealed by operation of law (without need of a separate court order directing sealing). The clerk of the court hearing the criminal case must then "immediately notify the commissioner of the division of criminal justice services and the heads of all appropriate police departments and other law enforcement agencies" of the favorable termination and of the sealing requirement. (Id. § 160.50 [1].)
The statute provides that the court may determine at the time of favorable termination that the record should remain unsealed, should a motion on notice by the district attorney "demonstrate to the satisfaction of the court that the interests of justice" require leaving the record unsealed. (Id.) It is undisputed that the Manhattan District Attorney did not move in Criminal Court for a determination that petitioners' records should remain unsealed. Nor did respondent ask the Manhattan District Attorney to make that motion. (See NYSCEF No. 612 at Tr. 6-7.)
Section 160.50 (1) specifies several categories of materials that must be sealed or returned to the defendant. (See id. § 160.50 [1] [a]-[c].) The broadest category of materials that must be sealed, described in paragraph (c), consists of "all official records and papers, including judgments and orders of a court but not including published court decisions or opinions or records and briefs on appeal, relating to the arrest or prosecution." These statutorily enumerated records must be sealed "and not made available to any person or public or private agency."
Paragraph 160.50 (1) (d) identifies six narrow exceptions to the statutory bar on disclosure (none of which are contended to apply here). (See id. § 160.50 [1] [d].) That these "exceptions are precisely drawn" underscores a legislative "commitment to prohibiting disclosure of sealed records—once initial sealing has not been forestalled by the court in the interests of justice—except where the statute explicitly provides otherwise." (Matter of Katherine B. v Cataldo, 5 NY3d 196, 203 [2005].)
CPL 160.60 provides that upon favorable termination of an arrest or prosecution within the meaning of § 160.50, "the arrest and prosecution shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution." Additionally, the arrest or prosecution "shall not operate as a disqualification of any person so accused to pursue or engage in any lawful activity, occupation, profession, or calling." (Id.) And except where specifically required or permitted by statute or court order, "no such person shall be required to divulge information pertaining to the arrest or prosecution." (Id.)
Petitioners contend that the disciplinary determinations at issue must be annulled in light of the effect of the sealing statutes here. In particular, petitioner argues, a necessary element of those determinations—the factual finding that each petitioner was part of the group of people who occupied Hamilton Hall—rested on evidence that was inadmissible under CPL 160.50 and 160.60 because it had been sealed. (See NYSCEF No. 310 at 12-15.) Respondent, by contrast, argues that (i) these sealing statutes do not apply here; and (ii) the UJB would have been entitled [*9]to consider and rely on the challenged evidence regardless. (See NYSCEF No. 566 at 10-17.) Although the parties cite caselaw construing these statutes, they have not provided, and this court's own research has not identified, any precedent that directly controls the particular legal questions raised by petitioners' contentions. This court must consider these questions for itself.
The parameters of the sealing-related questions before this court are set, in turn, by several material (and largely undisputed) aspects of the underlying factual circumstances.
The criminal charges brought against petitioners were dismissed, and the records relating to those charges sealed, in June 2024. (NYSCEF No. 559 at ¶ 52.) Respondent brought the disciplinary proceedings at issue against petitioners more than two months later, in August 2024. (Id. at ¶ 61.)
It is undisputed that in those disciplinary proceedings, the sole evidence before the UJB that petitioners were part of the group occupying Hamilton Hall was an "Offense/Incident Report" prepared by the Columbia University Department of Public Safety about that occupation. (See NYSCEF No. 612 at Tr. 4-6; NYSCEF No. 318 at 3 [UJB determination in J. Doe 1's proceeding]; NYSCEF No. 574 [incident report].) This incident report was undisputedly prepared using solely information provided to the Columbia Department of Public Safety by the NYPD in the immediate aftermath of the NYPD's ending of that occupation. (See NYSCEF No. 584 at Tr. 75-76 [transcript of Nov. 13, 2025, oral argument]; NYSCEF No. 612 at Tr. 4-6); see also NYSCEF No. 577 at ¶ 4 [affirmation by a representative of respondent].)
The incident report does not contain any information about petitioners' conduct. Instead, it includes a brief general narrative about the occupation of Hamilton Hall; that narrative does not identify actions taken by any particular individual. (See NYSCEF No. 574 at 7 [pdf pagination].) The report lists several forms of wrongful conduct, which it describes as "offenses"—e.g., "burglary," "criminal trespass," "criminal mischief," and "unlawful imprisonment." (See NYSCEF No. 574 at 2, 5, 9, 12-13.) And it names as "suspects" both petitioners and numerous other individuals not affiliated with Columbia University. (See NYSCEF No. 307 at 2-4, 5-9 [pdf pagination] [unredacted version of the incident report, filed under seal].)
Thus, (i) the UJB's disciplinary determinations took into account (ii) evidence only of the fact of petitioners' arrests. That evidence was (iii) provided to Columbia pre-sealing and considered by the UJB post-sealing; and (iv) it was provided to the UJB in the form of a report that was derived from, but did not quote from or attach, petitioners' arrest records.
In these circumstances, evaluating whether CPL 160.50 and 160.60 rendered improper the UJB's reliance on that evidence entails several layers of analysis. Subsection II.B.1 addresses whether §§ 160.50 and 160.60 apply at all to the use of sealed records by private parties. Subsection II.B.2 discusses whether it is material that the information about the fact of the arrest, although considered by the UJB post-sealing, was first provided to Columbia pre-sealing. Subsection II.B.3 considers whether §§ 160.50 and 160.60 preclude reliance on information about the fact of an arrest drawn from sealed arrest records and incorporated into new documents, as opposed to reliance on the sealed records themselves. Subsection II.B.4 considers whether the way in which the UJB relied on the fact of petitioners' arrests was permissible under the sealing statutes.
This court concludes that the sealing statutes do apply to the use of sealed records by private entities like respondent (and the UJB as an administrative body of respondent). The information at issue was drawn exclusively from sealed arrest records, reflects only the fact of [*10]petitioners' arrests, was obtained by Columbia directly from the NYPD, and was considered and relied upon by the UJB post-sealing to establish facts material to the charged disciplinary violations. In these circumstances, CPL §§ 160.50 and 160.60 rendered improper the UJB's reliance on that information.
B. Whether CPL 160.50 and 160.60 Rendered Inadmissible Information Reflecting the Fact of Petitioners' Arrests
1. Whether CPL 160.50 and 160.60 bind private entities like the UJB
The first issue presented by petitioners' sealing argument is whether CPL 160.50 and 160.60 apply at all to the UJB's consideration of the fact of petitioners' arrests. Respondent argues that these statutes do not apply to private bodies like the UJB. (See NYSCEF No. 566 at 10-11.) Petitioners contend that private actors like the UJB, like public entities, are "prohibited from relying on sealed arrest records." (NYSCEF No. 578 at 20.) This court agrees with petitioners.
a. 160.50
Respondent's argument focuses on the language of § 160.50. Respondent contends that no restriction existed on the UJB's considering the incident report, because CPL 160.50 "does not impose any legal duties on private actors." (NYSCEF No. 566 at 10.) Respondent says that this statute only "prohibits the release of records by governmental entities to private actors after the conclusion of criminal proceedings in favor of the accused." (Id. at 11 [emphasis in original].) Because the statute lacks language prohibiting private actors from disclosing sealed records, respondent contends, the UJB was free to consider, and rely on, the incident report. (See id.) That is, the scope of the post-sealing restrictions on use of sealed records should be understood to track the scope of the restrictions on disclosure of those records. (See NYSCEF No. 566 at 11; NYSCEF No. 584 at Tr. 70-71, 73-74.)
Section 160.50 does not, however, require "governmental entities," generally, to seal arrest/prosecution records after termination favorable to defendant, and then refrain from releasing those records. The statute provides more specifically that following favorable termination, all arrest/prosecution-related official records "on file with the division of criminal justice services, any court, police agency, or prosecutor's office" must be sealed and "not made available to any person or public or private agency." (CPL § 160.50 [1] [c].) Yet the caselaw construes § 160.50 to forbid the use of sealed records by governmental entities outside the statutorily enumerated categories. (See e.g. Matter of Rosa v New York City Hous. Auth., Straus Houses, 160 AD3d 499, 499-500 [1st Dept 2018] [sustaining a Housing Authority administrative determination because it was not based on sealed records or testimony relying on sealed records]; Matter of Burr v Goord, 283 AD2d 891, 892-893 [3d Dept 2001] [holding that the State Department of Correctional Services could not include references to sealed arrests in prison-inmate records]; Matter of 53rd St. Rest. Corp. v New York State Liq. Auth., 220 AD2d 588, 588 [2d Dept 1995] [holding that a police officer could not review sealed arrest records to refresh his recollection when testifying in an administrative-enforcement proceeding brought by the State Liquor Authority against a restaurant for permitting illegal gambling].) These cases do [*11]not suggest that the scope of the rule forbidding use of sealed records derives from a statutory enumeration of the particular types of agencies that must seal the records and refrain from disclosing them. The cases presuppose that, absent an express statutory exception, the statute imposes a categorical prohibition on post-sealing use of sealed arrest/prosecution records.
Additionally, in Matter of Rosa, the First Department equated "testimony . . . improperly based on sealed records" with "reception of erroneously unsealed evidence." (160 AD3d at 499-500 [internal quotation marks omitted]; see also Matter of Dockery v New York City Hous. Auth., 51 AD3d 575, 575 [1st Dept 2008] [equating admission of sealed materials at an administrative hearing with "reception of erroneously unsealed evidence"] [internal quotation marks omitted].) These decisions suggest that impermissibly using or permitting use of sealed records (or of testimony based on those records) should be understood as a de facto unsealing of records that has occurred outside the limited circumstances in which CPL 160.50 [1] [d] permits unsealing. (Cf. NYSCEF No. 310 [petitioners' mem. of law] [making a version of this point].) That understanding would not be affected by whether the body using (or permitting use of) sealed records is private or public.
Indeed, the language of § 160.50 itself places public and private entities on the same footing with respect to that prohibition on using sealed records. The statute directs the sealing records on file with specified types of agencies, and then provides that those sealed records may not be "made available to any person or public or private agency." CPL § 160.50 [1] [c] [emphases added].) This disclosure bar treats private and public actors equally. It aims to prevent anyone, public or private, from using or considering sealed records, unless an express exception applies. And in Matter of Alonzo M. v New York City Department of Probation, the Court of Appeals explained that the sealing statutes aim "to preclude access by those, especially in government and bureaucracy, who might otherwise prejudicially use rightfully protected information." (72 NY2d 662, 668 [1988]) [emphasis added].) Matter of Alonzo M.'s characterization of use of sealed information by governmental actors as a primary—rather than exclusive—concern of §§ 160.50 and 160.60 cuts against the view that these statutes do not apply to private entities.
Construing § 160.50 as barring use of sealed records by private entities, as well as public ones, also follows from the Legislature's goal in enacting the statute: To "ensure that the protections provided be 'consistent with the presumption of innocence, which simply means that no individual should suffer adverse consequences merely on the basis of an accusation, unless the charges were ultimately sustained in a court of law.'" (People v Patterson, 78 NY2d 711, 716 [1991], quoting Governor's Approval Mem., 1976 McKinney's Sess Laws of NY at 2451.) That objective focuses on limiting the use of sealed records, without regard to the nature of the party using them.[FN15]

Moreover, appellate caselaw applying § 160.50 has also described the statute as "creat[ing] a statutory privilege intended to ensure confidentiality and protect an individual from the potential stigma resulting from a criminal matter." (Wright v Snow, 175 AD2d 451, 452 [3d Dept 1991]; accord Rodriguez v Ford Motor Co., 301 AD2d 372, 372 [1st Dept 2003] [same], citing Green v Montgomery, 95 NY2d 693, 701 [2001]; Gebbie v Gertz Div. of Allied Stores of NY, 94 AD2d 165, 168-171 [2d Dept 1983] [same].) As a statutory privilege, § 160.50 affords rights to private parties in litigation as against each other—shielding a party from the obligation to produce sealed records in discovery, for example (see CPLR 3101 [b]), or entitling a party to claw back inadvertently produced information within the statute's scope (see Irons v State, 2024 NY Slip Op 51098[U], at *3-6 [Ct Cl 2024]). That the caselaw treats § 160.50 as an evidentiary privilege underscores that it binds private entities, as well as governmental actors.
Support for this conclusion also stems from caselaw interpreting the closely related confidentiality provision shielding records of youthful-offender adjudications in CPL 720.35 (2). Similarly to CPL 160.50, § 720.35 provides that "official records and papers, whether on file with the court, a policy agency or the division of criminal justice services, relating to a case involving a youth who has been adjudicated a youthful offender, are confidential." (CPL 720.35 [2].) The statute forbids these records and papers from "be[ing] made available to any person or public or private agency," except as specified in the statute. (Id.) As with § 160.50, this statutory paragraph does not discuss (or restrict) private parties. But the Appellate Division has held that a court may not consider youthful-offender-adjudication records shielded by § 720.35 when a private party seeks to rely on those records in litigation against another private party. (See Royal Globe Ins. Co. v Mottola, 89 AD2d 907, 908 [2d Dept 1982].)
Thus, the scope of § 160.50 requires arrest and prosecution records held by particular agencies to be sealed. Once records have been sealed, no one may disclose or use them, unless the shield against their use has been waived (or unless one of the entities listed in § 160.50 [d] [1] obtains an unsealing order).
b. CPL 160.60
Additionally, as petitioner points out (see NYSCEF No. 578 at 17), CPL 160.50 does not stand alone. It was enacted in tandem with CPL 160.60. This court agrees with petitioner that reading the two statutes together bolsters the conclusion that their sealing-related restrictions apply to private entities.
Section 160.60 provides that upon favorable termination within the meaning of § 160.50, "the arrest and prosecution shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution." As respondent acknowledges, § 160.60 serves to "reinforce[] the sealing requirement" imposed by § 160.50. (NYSCEF No. 566 at 14.) Section 160.60 establishes that upon favorable termination, not only must arrest/prosecution records be sealed, but also that the arrest/prosecution itself must be treated as a legal nullity—as void ab initio.[FN16]

The scope of the restrictions on use of records sealed by § 160.50 must be understood in light of (i) § 160.60's having rendered void arrests/prosecutions following favorable termination, and (ii) that statute's returning of a formerly accused to their pre-arrest legal status. Reading § 160.50 narrowly—i.e., as applying only to governmental entities—would create tension between § 160.50 and § 160.60. On that narrow reading of § 160.50, private entities would be free to treat a favorably terminated prosecution as having gone forward, rather than being wiped from the record as a nullity, as § 160.60 directs. What is more, these private entities would also be free to rely on the mere fact of an arrest as a ground for making determinations adverse to the (formerly) accused. It is difficult to see how that outcome could be consistent with restoring an accused to a pre-arrest legal status, as § 160.60 provides.
Respondent contends that CPL 160.60 itself does not apply to private actors. (See NYSCEF No. 566 at 14-15.) Section 160.60 does not, however, expressly provide that it applies only to public entities. And this statute's directive to "deem[] a nullity" any favorably terminated prosecution, and to restore the accused's pre-arrest legal status, appears on its face to encompass actions of private parties, not only governmental ones, directed toward formerly accused individuals. Moreover, the mischief the Legislature was seeking to address—avoiding adverse consequences to individuals accused but then not convicted of crimes—is not limited to consequences imposed by the government.
Further, this court has found no authority that § 160.60 binds only governmental entities. Respondent misplaces its reliance on the motion-court decisions in Matter of Brown v Passidomo (127 Misc 2d 700 [Sup Ct, Erie County 1985]) and Romero v State (33 Misc 3d 599 [Ct Cl 2011]). (See NYSCEF No. 566 at 14-15.)
In Matter of Brown, petitioner sought an order that would (i) direct the Department of Motor Vehicles to expunge a driving-related conviction (reversed on appeal) from the DMV's records, and (ii) prohibit the DMV from disseminating conviction-related information to automobile insurers. (See 127 Misc 2d at 701.) In opposing the petition, the DMV argued that it was not the proper respondent—that instead of suing the DMV, petitioner should have sued only his former insurer for cancelling his policy in light of the information the DMV provided to the insurer. (See id. at 705.) The motion court rejected that argument. The court held that in addition to any action against the insurer, CPL 160.60 gave petitioner a remedy against governmental entities like the DMV "to insure that a person in Petitioner's position be protected from dissemination of information as well as from the acting upon the information so disseminated." (Id.) That ruling is quite different from holding that § 160.60's protections apply only as against [*12]governmental entities.
Romero concludes, among other things, that the enactment of § 160.60 alongside § 160.50 reflected the Legislature's intent to permit "a person whose conviction was terminated in his favor" to "proceed[] against a State agency" to seek damages for the improper consideration or disclosure of sealed arrest/prosecution records. (NYSCEF No. 566, quoting Romero, 33 Misc 3d at 604 [emphasis omitted].) But the quoted language does not address whether, and in what ways, § 160.60 binds private actors. Nor would the Romero court have had occasion to consider that issue. By definition, the Court of Claims adjudicates (i) damages claims against (ii) the State—not claims against private parties. (See NY Constitution, article VI, § 9; Court of Claims Act § 9.)
c. Executive Law § 296 (16)
Respondent argues that if CPL 160.50 and 160.60 bind private parties, there would be no need for Executive Law § 296 (16). (See NYSCEF No. 296 at 4.) This court disagrees.
Executive Law § 296 (16), together with § 297, provides a private right of action for damages against private actors who rely adversely on an individual's sealed arrest/prosecution-related records "in connection with the licensing, housing, employment, including volunteer positions, or providing of credit or insurance to such individual." (Executive Law § 296 [16]). On respondent's position, § 296 (16) and § 297 constitute the sole protection, and sole remedy, for private parties' use of sealed records. In other words, respondent would have it that the Legislature left private parties free to use individuals' sealed arrests against them, as long as they do so in contexts outside § 296 (16)'s scope—such as the UJB proceedings here.
This interpretation is difficult to square with the Legislature's stated goals in enacting CPL 160.50 and 160.60 and Executive Law § 296 (16), discussed in Paragraph II.B.1.a, supra. Nor is it the only available way to understand the interaction of §§ 160.50 and 160.60 with § 296 (16).[FN17]
One might instead read §§ 160.50 and 160.60 as directing sealing and barring post-sealing use of sealed records by private parties as well as governmental entities, with § 296 (16) supplying a damages remedy for some of the most prevalent (or most harmful) wrongful uses of sealed records by private parties.[FN18]
The court finds this interpretation more persuasive than [*13]respondent's reading. It better fulfills the statutes' purposes, yet still affords independent roles to §§ 160.50 and 160.60 and to § 296 (19).[FN19]

d. Caselaw interpreting CPL 160.50 and 160.60
The caselaw addressing whether CPL 160.50 and 160.60 bar private parties from relying on sealed arrest-related records is limited. But it uniformly cuts in favor of petitioners, not respondent.
This issue has arisen most frequently in eviction proceedings brought under Real Property Actions and Proceedings Law (RPAPL) §§ 711 (5) and 715 by private landlords, based on allegations that tenants had permitted the premises at issue to be used for illegal activity. Courts hearing eviction proceedings of this kind have held that a landlord may not introduce as evidence sealed arrest/prosecution-related records to support allegations that the tenant was engaged in illegal activity. (See 1240 Sheva Rlty Assoc. v Serrano, 2023 NY Slip Op 31022[U], at *3 [Civ Ct, Hous Part, Bronx County 2023, Baum, J.] ["The sealing of the documents in the criminal case file serves to place limitations on the evidence that Petitioner may present at trial to prove the allegations of Respondent's illegal use of the apartment."]; 230 W 140 Inc. v Carter, 2016 NY Slip Op 51037[U], at *2 [Civ Ct, Hous Part, NY County 2016, Kraus, J.] [granting motion to preclude petitioner-landlord to support allegations of illegal activity using evidence from records sealed under CPL 160.50 and 160.60];[FN20]
M.S. Hous. Assocs. v Williams, 2006 NY Slip Op 52105[U], at *1, *2 [Civ Ct, Hous Part, NY County 2006, Martino, J.] [same].)
Similarly, a court hearing a nuisance-type holdover eviction proceeding brought by a private landlord has held that § 160.50 would bar the landlord "from introducing any sealed criminal records at trial" to support its case. (Rego Park Ventures v Shany, 2023 NY Slip Op 50974[U], at *3 [Civ Ct, Hous Part, Queens County 2023, Guthrie, J.].)
Additionally, courts in other proceedings have held that prosecutors may not obtain orders unsealing arrest/prosecution records that are in landlords' possession, so as to permit the landlord to use those records in illegal-activity eviction proceedings. (See People v F.B., 155 [*14]AD3d 1, 3-8 [1st Dept 2017] [interpreting the parallel sealing requirements of CPL 160.55];[FN21]
People v Diaz, 15 Misc 3d 410, 411-414 [Sup Ct, NY County 2007, Soloff, J.]; People v Canales, 174 Misc 2d 387, 388-391 [Sup Ct, Bronx County 1997, Richter, J.].) A necessary premise of these decisions (and the motions these decisions resolve) is that the sealing provisions of CPL §§ 160.50 and 160.60 bind private parties and foreclose them from introducing sealed records as evidence in later proceedings. That is, if it were the case that §§ 160.50 and 160.60 impose restrictions on governmental entities alone, there would have been no need for prosecutors to have brought these unsealing motions. The (private) landlords in the related eviction proceedings could have simply introduced and relied on the sealed records without need for prosecutorial assistance. Instead, prosecutors brought unsealing requests, and courts adjudicated those requests on their merits, rather than denying them as academic.[FN22]
In so doing, both the prosecutors and the courts resolving their motions evinced a common understanding that CPL §§ 160.50 and 160.60 do apply to the use by private parties of sealed records in their lawful possession.
Conversely, this court has found no case, in any court, holding that a private party may properly take into account, or introduce as evidence, records that have already been sealed under §§ 160.50 and 160.60. Respondent cites only two decisions of federal district courts, applying New York law, that decline to imply a right of action for damages against private parties for their disclosure of sealed records or information. (See Mauro v HireRight, 2019 WL 5788561, at *4 [ND NY Nov. 6, 2019]; Baunach v Liberty Mut. Fire Ins. Co., 2014 WL 1278122, at *2-4 [ED NY Mar. 27, 2014].) But whether a party's use or reliance on sealed information should be held improper in the context of later article 78 review is different from whether a party may be held liable in damages for improperly using or disclosing sealed information.
CPL § 160.50 prohibits private parties like the UJB, as well as governmental actors, from using or considering arrest/prosecution-related records after those records have been sealed under § 160.50 (except pursuant to an express statutory exception from those restrictions).
2. Whether it matters that the fact of petitioners' arrests was disclosed to respondent before the record of those arrests was sealed
Respondent argues that it should be material to this court's analysis that respondent received arrest-related information about petitioners from the NYPD before petitioners' criminal [*15]prosecutions were dismissed and sealed. (See NYSCEF No. 612 at Tr. 13 [statement of respondent's counsel at oral argument] ["What happened here is" that the NYPD's providing information to respondent about petitioners' arrests "all happened before the dismissal" of the charges against them, and "that's a critical point"]; see also NYSCEF No. 566 at 12-13; NYSCEF No. 296 at 2; NYSCEF No. 592 at 3.) This court finds more persuasive petitioners' contrary position—that "the relevant provisions of the [sealing] statute are not primarily about the timing of the possession of the sealed arrest information but the use of the sealed arrest information." (NYSCEF No. 310 at 17 [emphases in original].)
Several appellate decisions applying CPL § 160.50 support petitioners' position. For example, the Second Department's decision in Matter of 53rd Street Restaurant addressed circumstances in which the State Liquor Authority was considering whether to suspend petitioner's liquor license because petitioner's owner was arrested and prosecuted for permitting gambling on the premises. (See 220 AD2d at 588.) The arresting officer in the criminal case kept copies of arrest/prosecution-related records after the prosecution had been favorably terminated and sealed, and then used those documents to refresh his recollection during the administrative liquor-license-suspension proceeding. (See id.) The Second Department held that this use of sealed records was improper under § 160.50, although it sustained the underlying determination based on other evidence. (See id.) Under this ruling, the arresting officer's proper pre-sealing possession of the records did not permit a third party to elicit post-sealing testimony from the officer after consulting those records. (See id.; see also Trinity Preservation, L.P. v Roman, 2015 NY Slip Op 50142[U], at *1 [App Term, 1st Dept 2015] [same].)
Similarly, Matter of Bell v New York City Housing Authority (49 AD3d 284, 284 [1st Dept 2008]) and Matter of Ono v Long Island College Hospital (12 AD3d 299, 300 [1st Dept 2004]) dealt with scenarios in which administrative determinations drew on arrest/prosecution-related records that were later sealed. In sustaining those determinations, the First Department did not focus on the fact that police and prosecutors had provided respondents with the relevant records pre-sealing, but on the fact that respondents had considered and relied on those records pre-sealing. The Court treated the timing of use, not the timing of disclosure, as what counts for purposes of the sealing statutes. And in the eviction proceeding at issue in F.B., discussed in Paragraph II.B.1.d, supra, the Bronx District Attorney's Office had provided the landlord with arrest/prosecution records prior to sealing. Housing Court still held that the landlord could not use those records in the eviction proceeding, post-sealing. (See F.B., 155 AD3d at 3; accord 1240 Sheva Rlty Assoc., 2023 NY Slip Op 31022[U], at *3 [same].)
Treating the timing of disclosure as material also would conflict with Appellate Division precedents interpreting analogous protections afforded by Domestic Relations Law (DRL) § 235 (1). Section 235 (1) prohibits court staff, absent court order, from disclosing matrimonial filings to, or permitting their examination by, anyone other than the parties or their counsel.[FN23]
Third [*16]parties may still properly come into possession of those filings—for example, if the filings have been provided to them by a party to the matrimonial action. (See Tornheim v Blue & White Food Prods. Corp., 73 AD3d 747, 748 [2d Dept 2010].) Nonetheless, the First Department has held that a matrimonial filing "would be inadmissible in an unrelated action pursuant to Domestic Relations Law § 235(1)." (Flynn v Flynn, 175 AD2d 51, 52 [1st Dept 1991].) Again, a private party's lawful possession of sealed records does not, without more, entitle the private party to introduce those records in another proceeding over an objection by that party's adversary.[FN24]

To be sure, the Appellate Division caselaw discussed in the preceding paragraphs does not squarely address or resolve whether a party may use, post-sealing, records sealed under CPL § 160.50, as long as the party obtained those records pre-sealing. These precedents thus do not necessarily dictate the conclusion that the key point in time for § 160.50 purposes is when the sealed records are used or relied on, as opposed to when the records were obtained. But at a minimum, the caselaw, taken as a whole, points strongly in that direction.
Respondent's position that this court should focus on the timing of disclosure also does not line up with the function that the use-restriction serves within the statutory scheme of §§ 160.50 and 160.60. Respondent is arguing that what matters for purposes of restrictions on use is when arrest/prosecution records are disclosed to a party, relative to the time when those records become sealed, not when the party uses the records, relative to sealing. Treating the time of disclosure (not the time of use) as dispositive might make sense if restrictions on the use of sealed records operated as a penalty for a party's having improperly disclosed sealed records—i.e., as a kind of exclusionary-rule scheme. On that logic, if entities subject to the disclosure restrictions of § 160.50 were improperly to disseminate sealed records, then the party receiving the records should be precluded from using them later, to prevent evasions of the statutory disclosure restrictions.
The difficulty for respondent is that use-restrictions derived from § 160.50 do not function that way. Neither the statute nor caselaw characterizes restrictions on use of sealed records as a penalty for improper disclosure.
For that matter, the Court of Appeals has declined to impose the penalty of suppressing evidence when that evidence was obtained through the improper use of records sealed under § 160.50. (See People v Patterson, 78 NY2d 711, 714-717 [1991].) Similarly, as noted above (see note 14, supra), the erroneous admission of sealed records in a judicial or administrative proceeding does not, without more, entail reversal or annulment of any resulting determination.[FN25]
(See Matter of Charles Q., 85 NY2d at 575.)
The precedents in this context, reading CPL 160.50 and 160.60 together, have instead implied a freestanding shield against the use, discoverability in litigation, or admissibility in evidence of arrest/prosecution records when—because—they have been sealed under § 160.50. [*17](See Rodriguez, 301 AD2d at 372.) This shield works to benefit the formerly accused, not to punish a party that received (and then used) improperly disclosed records. It "restore[s] accuseds 'in contemplation of law to the status [they] occupied before the arrest and prosecution.'" (Patterson, 78 NY2d at 715 [quoting § 160.60] [alteration in original].) Consistent with that legislative aim, the shield against using sealed records serves to prevent an individual from "suffering adverse consequences merely on the basis of an accusation, unless the charges were ultimately sustained in a court of law." (Patterson, 78 NY2d 716 [internal quotation marks omitted].) And for that purpose, the relevant moment in time (relative to sealing) is when the party in possession of sealed records seeks to use or rely on those records to the detriment of the formerly accused.[FN26]

Respondent does not identify an analytical or functional justification for why the timing of the disclosure of records (relative to the records' sealing) is what should matter with respect to whether those records may be used post-sealing. Nor does respondent show that countervailing appellate authority treats the timing of disclosure (not the timing of use) as key. Respondent's timing argument relies on one Appellate Division decision, Matter of Thygesen v North Bailey Volunteer Fire Co. (100 AD3d 1416 [4th Dept 2012]); and three trial-court decisions, People v Mitchell, 2025 NY Slip Op 51901[U] [Crim Ct, Kings County 2025, Glick, J.]; Matter of Young v City of New York (68 Misc 3d 514 [Sup Ct, Kings County 2020, Levine, J.], affd 221 AD3d [*18]721 [2d Dept 2023]); and Matter of Ithaca Journal News v City Court of Ithaca (58 Misc 2d 73 [Sup Ct, Tompkins County 1968]). (See NYSCEF No. 592 at 4-5.) Those decisions do not persuade this court that the timing of disclosure is what should matter.
Neither Matter of Thygesen nor Matter of Young relies on the principle that arrest records may be used or considered by a party after sealing, as long as the records were disclosed to that party before sealing. These decisions do not discuss at all the significance of timing (whether of the release or the use of sealed records). As discussed further in Subsection II.B.3, infra, these decisions focus on (i) when arrest-related information obtained from sealed records may be used; and, relatedly, (ii) the distinction between information about the fact of an arrest and information about the conduct underlying that arrest. (See Matter of Thygesen, 100 AD3d at 1417; Matter of Young, 68 Misc 3d at 517-518.) And, as also discussed in that subsection, the conclusions of these decisions on those two issues do not validate the UJB's post-sealing reliance on the fact of petitioners' (sealed) arrests.
In Mitchell, the district attorney's office sought to rely on a copy of an order of protection issued during a separate prosecution that was later dismissed and sealed. The People argued in the later prosecution that because they had obtained a copy of the order of protection before the sealing of the earlier prosecution, they could properly rely on that order to support charges in the later one. (See 2025 NY Slip Op 51901[U], at *3.) The trial court in the second case agreed, concluding that the prosecutors' reliance on the order of protection in that case meant that the order was "not a record from a sealed case, but rather a record from this open matter," and thus outside the scope of CPL 160.50. (Id.)
This conclusion, however, runs counter to decisions of the Appellate Division, discussed in more detail in Subsection II.B.3, infra, that information about now-sealed arrests may not be incorporated into documents that are not themselves subject to sealing. (See Matter of Palacio v Morgenthau, 13 AD3d 282, 282 [1st Dept 2004]; Matter of Burr v Goord, 283 AD2d 891, 892-893 [3d Dept 2001].) If information drawn from sealed records is still subject to sealing after having been incorporated into other documents (as these decisions hold), it follows that documents from a sealed case are still subject to sealing after having been incorporated into the record of a different, non-sealed case. And to the extent Mitchell holds more generally that when a prosecutor obtains a document from Case 1 before the record in Case 1 is sealed at all, the prosecutor is permitted to rely on that document in Case 2 after the sealing of the record in Case 1, this court respectfully declines to follow that holding.[FN27]

Matter of Ithaca Journal News v City Court of Ithaca—decided before the Criminal Procedure Law was enacted—involved a different statutory scheme that operated differently from CPL 160.50 and 160.60. (See 58 Misc 2d at 76 [describing applicable statutory provisions].) In that case, a City Court judge hearing misdemeanor criminal charges against three minors ordered, pursuant to § 913-f of the (former) Code of Criminal Procedure, that the misdemeanor informations laid against the minors be sealed. (See id. at 75-76.) A newspaper reporter who was already aware of the arrests of and charges against the minors before the judge issued the sealing order then published an article naming two of the minors, their alleged offense, and that their offense amounted to petit larceny. (See id. at 75.) The City Court judge, on the application of the minors' counsel, initiated contempt proceedings against the reporter and her newspaper, and denied their motion to dismiss. (See Matter of Wiggins v Ithaca Journal News, 57 Misc 2d 356, 364-365 [Ithaca City Ct. 1968].) The reporter and newspaper brought a CPLR article 78 proceeding in Supreme Court, seeking a writ of prohibition. (See Matter of Ithaca Journal News, 58 Misc 2d at 75-76.) Supreme Court issued the requested writ, concluding that the City Court judge had exceeded his authorized powers. (Id. at 77-78.) Supreme Court held that City Court's statutory power to seal the misdemeanor information against minor defendants did not bring with it authority "to direct a representative of the news media to conceal the identity of a 'youth' arrested for a misdemeanor when that fact is known before the formal written information has been ordered sealed." (Id. at 77.)
Respondent argues that, as in Matter of Ithaca Journal News, petitioners are "seeking to have this Court exceed its authority by extending the statutes at issue to a private party," i.e., Columbia. (NYSCEF No. 592 at 5.) But this court would not be exceeding its authority were it to grant the CPLR article 78 petition here challenging the underlying UJB disciplinary determinations. Respondent would presumably appeal that ruling as (assertedly) incorrect. Arguing on appeal that this court erred in its exercise of authority, though, is different from seeking a writ of prohibition on the ground that this court's ruling "exceed[ed] its authorized powers in a proceeding over which it has jurisdiction"—the issue in Matter of Ithaca Journal News. (See 58 Misc 2d at 77.)
Relatedly, the scope in that case of City Court's authority to issue a sealing order preventing publication of information obtained pre-sealing was a statutory question. It turned on the details, not only of the sealing provision relied on by City Court (Code of Criminal Procedure § 913-f), but also on that statute's relationship with other, related statutes in the Family Court Act. (See id. at 76-77.) Respondent provides no authority or explanation that might show the statutory scheme created by CPL 160.50 and 160.60, and Executive Law § 296 (16), to be relevantly similar to the one at issue in Matter of Ithaca Journal News.[FN28]

Moreover, the facts of Matter of Ithaca Journal News are materially different from those underlying this proceeding. The document discussed in Matter of Ithaca Journal News was the criminal information—"the formal written allegation made to a magistrate that a person has been guilty of some designated crime." (58 Misc 2d at 76.) But City Court's denial of the motion to dismiss the underlying contempt proceeding did not rest on the court's view that the newspaper article at issue had improperly drawn facts from the criminal information in the case. To the contrary, the court suggested that its order had prohibited publication of details obtained from "a police officer, as it appears may have been done in the case," if those details related to a proceeding in which the criminal information had been sealed. (See Matter of Wiggins, 57 Misc 2d at 362; see also id. at 357 [reproducing article].) The analogous issue in this proceeding would be whether the UJB could properly consider evidence drawn from post-sealing newspaper articles that published information about petitioners' arrests. That is not what occurred here, and it is not the issue presented by petitioners' article 78 petition. Matter of Ithaca Journal News is sufficiently dissimilar that it is not helpful here—even setting aside that it is a single, fifty-year-old trial-court decision.
The UJB was not entitled to take into account the fact of petitioners' arrests after those arrests were sealed. That the NYPD had informed respondent's Department of Public Safety of the fact of petitioners' arrests pre-sealing does not alter this conclusion.
3. Whether CPL 160.50 and 160.60 barred the UJB's consideration of arrest-related information contained in the Department of Public Safety incident report
Respondent also argues that CPL 160.50 "does not apply to records generated by private actors, even if (as here) those privately generated records include information obtained from law enforcement." (NYSCEF No. 566 at 11 [emphasis in original].) That is, respondent takes the position that the UJB could rely on information reflecting the fact of petitioners' sealed arrests because that information was contained in documents not subject to sealing. This position is unpersuasive.
a. Whether the sealing statutes bar consideration of the fact of a sealed arrest when that fact is reflected in documents not subject to sealing
Respondent emphasizes (and petitioners do not dispute) that Columbia's Department of Public Safety incident report reflecting petitioners' arrests is not an official arrest-related records within the meaning of the statute. But that alone does not mean that the UJB's relying on the information contained in that report is consistent with CPL 160.50 and 160.60. (See id. at 11-12; NYSCEF No. 296 at 2-3.) As petitioners contend (see NYSCEF No. 578 at 22-23), it would make little sense to hold that although an arrest record itself may be sealed and deemed a nullity, the fact of the arrest, once drawn from that record and republished in a new document, may be relied upon freely or introduced as evidence in judicial or administrative proceedings. (Cf. State [*19]Farm Fire & Cas. Co. v Bongiorno, 237 AD2d 31, 35 [2d Dept 1997] [concluding, with respect to a youthful-offender-adjudication records shielded by CPL 720.35 [2], that it "is illogical to conclude that there is a distinction between the confidentiality of the physical records and papers, as opposed to the information they hold," and that doing so "would be, in the most literal sense, to place form over substance"].)
Thus, as mentioned in Subsection II.B.2, supra, the Appellate Division has held that information about a now-sealed arrest or prosecution may not be disclosed by, or included in, documents that would not themselves be official records subject to sealing under § 160.50 (1) (c). In Matter of Palacio, the First Department held that an assistant district attorney's parole recommendation to the State Division of Parole about an inmate could not reference earlier arrests of the inmate's that had been sealed under § 160.50 upon dismissal of charges. The Court therefore granted the inmate's request under CPLR article 78 to void and seal that recommendation, and to require the district attorney's office to submit a new, conforming parole recommendation. (See 13 AD3d at 282.) In doing so, the First Department rejected the People's argument on appeal that "CPL § 160.50 did not prohibit the prosecutor from mentioning Palacio's prior arrests, which were relevant on the issue of Palacio's parole release, as long as official records or papers pertaining to those arrests that had been sealed were not furnished." (Br. for Respondents, Matter of Palacio, 2004 WL 5362745, at *12 [1st Dept Oct. 2004].)
Similarly, in Matter of Burr, the Appellate Division, Third Department, held that § 160.50 prohibited the State Department of Correctional Services (DOCS) from including references to sealed arrests in an inmate's prison records.[FN29]
(See 283 AD2d at 892-893.) The Court granted the inmate's request under CPLR article 78 to remove any references in his prison record to those sealed arrests. (See id. at 893-894.)
For the reasons in Subsections II.B.1 and II.B.2, supra, CPL 160.50 and 160.60 applied to the disciplinary proceedings before the UJB, and would have barred the UJB from admitting or considering now-sealed records of petitioners' arrests. Under Matter of Palacio and Matter of Burr, respondent's Department of Public Safety having drawn information reflecting the fact of petitioners' arrests from sealed records, and then incorporating that information into an incident report outside the scope of CPL 160.50, did not make permissible the UJB's post-sealing consideration of that information.[FN30]

Matter of Palacio and Matter of Burr addressed scenarios in which the sealed information at issue stated in so many words that the petitioners in those proceedings had been arrested. (See Matter of Palacio, 13 AD3d at 282; Matter of Burr, 283 AD2d at 892.) Respondent argues that the UJB's consideration of the incident report was proper in part because the reports did not "identify Petitioners as having been arrested," or "even use the word 'arrest.'" (NYSCEF No. 296 at 7.) Although the incident report does not use the word "arrest," it does describe in criminal-law terms several of the offenses that petitioners were suspected of having committed—e.g., "burglary," "criminal trespass," "criminal mischief," and "unlawful imprisonment." (See NYSCEF No. 574 at 1, 4, 8, 9, 12-13.) For that matter, petitioners allege, and respondent does not dispute, that respondent had initially included not only the incident report, but also screenshots of the dockets of petitioners' criminal proceedings, in respondent's investigative files on petitioners. (See NYSCEF No. 559 at ¶ 59.)
Regardless, it is irrelevant for present purposes that the incident report does not expressly refer to petitioners as having been arrested. As discussed in Paragraph II.B.1.b, supra, CPL 160.60 provides that "the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution." That restoration cannot occur if a party is free to use information derived from the arrest against the formerly accused. Whether the sealing statutes permit, or forbid, a party from repackaging information from sealed arrest records into a new document should not depend on whether the repackaged information uses the word "arrest" or "arrestee" to describe the formerly accused. Nor has this court found precedents that deem material the particular descriptive language used in that repackaged information.
This court therefore concludes that the sealing statutes barred the UJB's consideration of the sealed information in the incident report reflecting the fact of petitioners' arrests—just as those statutes would have foreclosed the UJB from considering the sealed arrest records themselves. (See NYSCEF No. 310 at 18-20.)
b. Whether the precedents cited by respondent entail a different conclusion
In seeking to vindicate the UJB's consideration of the sealed arrest information, respondent relies heavily on inapposite precedents. Many of the cases respondent cites address only whether particular documents or materials constitute official records requiring sealing in full under CPL 160.50 (1) (c)—not whether a party may use or rely on information drawn from sealed official records and reproduced in other documents. (See NYSCEF No. 268 at 11-12, citing City of Elmira v Doe, 11 NY3d 799, 800 [2008] [holding that preexisting police property-[*20]related records did not become official records for purposes of the sealing statutes by virtue of being material to a criminal investigation]; Matter of Dockery v New York City Hous. Auth., 51 AD3d 575, 575 [1st Dept 2008] [holding that 911 recordings were not official records subject to sealing]; Matter of Hynes v Karassik, 63 AD2d 597, 598 [1st Dept 1978] ["[A] tape recording made in the course of an investigation does not become an official record required to be sealed under the section simply because it is marked in evidence as an exhibit in the course of a criminal trial."], affd 47 NY2d 659 [1979]; People v P.D., 78 Misc 3d 352, 359 [Crim Ct, Kings County 2023, Holderness, J.] [holding that domestic incident reports prepared by police officers were not official records subject to sealing]; Matter of N.J. (S.H.), 85 Misc 3d 1081, 1086 [Fam Ct, Kings County 2024, Hettleman, J.] [same]; accord Leah W. v Keith W., 2025 NY Slip Op 05041 [1st Dept Sept. 23, 2025] [addressing whether the materials at issue constituted official records]; Matter of Vrooman v Dentes, 205 AD2d 235, 237-238 [3d Dept 1994] [same].) These decisions are not relevant to, and do not affect, this court's analysis of whether respondent could use arrest-related information consistent with §§ 160.50 and 160.60.
Respondent does cite two appellate decisions and a trial-court decision that have considered the issue of sealed arrest information reproduced in other records not required to be sealed. (See NYSCEF No. 566 at 12-14, citing Matter of Amaker v Fischer, 120 AD3d 988 [4th Dept 2014]); Matter of Thygesen, 100 AD3d 1416; Matter of Young, 68 Misc 3d 514;[FN31]
accord NYSCEF No. 296 at 3 and NYSCEF No. 592 at 5, citing Matter of Thygesen and Matter of Young.) But the holdings in those three decisions do not dictate (or suggest) a conclusion that the sealing statutes permitted the UJB to rely on the challenged evidence in rendering its disciplinary determinations.
Matter of Amaker is inapposite here. The Appellate Division held in that case that § 160.50 did not "require respondent to remove any information concerning the 2006 incident from petitioner's inmate record," because that incident involved the arrest of petitioner's mother, not petitioner himself. (See 120 AD3d at 989.) Petitioner, the Court wrote, was not entitled to have information about his mother's now-sealed arrest removed from his record. (See id.) Petitioners here are challenging respondent's reliance on information about their own arrests.
Matter of Thygesen and Matter of Young address issues more similar to the ones presented by this proceeding than those in Matter of Amaker. On the particular factual record before this court, though, both Matter of Thygesen and Matter of Young are readily distinguishable.
Matter of Thygesen concerns a CPLR article 78 proceeding brought by a former volunteer firefighter. Petitioner had been arrested on criminal charges that were dismissed and sealed. Respondent volunteer fire company later expelled him from membership, following a hearing. (See 100 AD3d at 1417.) Two pieces of evidence at the hearing were (i) media reports about petitioner's now-sealed arrest; and (ii) the arresting officer's hearing testimony about a pre-arrest interview he had conducted of petitioner. (Id.) The Fourth Department rejected petitioner's argument that the fire company's consideration of this evidence violated § 160.50. The Court held that the fire company could permissibly consider the media reports because those reports [*21]did not constitute official records within the meaning of § 160.50's sealing requirement. It further held that the arresting officer had permissibly testified from memory about the conduct leading to petitioner's arrest, not the arrest itself. (Id.)
Respondent here argues that Matter of Thygesen shows that the UJB permissibly relied on the arrest-related information in the Columbia Department of Public Safety incident report. (NYSCEF No. 566 at 13.) This court disagrees. As discussed in the following paragraphs, one may reasonably read in two ways the Fourth Department's ruling on admissibility of the media reports at issue.[FN32]
But on either reading, the Fourth Department's analysis does not entail a conclusion that the UJB could properly consider the fact of petitioners' arrests, as reflected in the incident report.
On the first reading, one could understand Matter of Thygesen's analysis of the media reports' admissibility to reflect the Court's conclusion that arrest-related information taken from sources other than sealed records may properly be considered even after sealing. And as respondent points out (see NYSCEF No. 592 at 3), the media reports at issue appear to have been derived from a police press briefing, rather than reflecting independent reporting (see NYSCEF No. 608 at 5-7). Also, much, although not necessarily all, of the information in those reports reflects merely the fact of Thygesen's arrest, rather than the underlying conduct for which he was arrested. (See id.) On this reading of Matter of Thygesen, if Columbia's Department of Public Safety had derived the information in the incident report from articles about the NYPD's ending of the occupation of Hamilton Hall and the arrests that the NYPD made in the process, the question before this court would be much closer. But that is not what happened here. It is undisputed that the arrest-related information in the incident report was instead based directly on communications from the NYPD to Columbia, rather than on some other source.[FN33]
(See NYSCEF No. 612 at Tr. 4-5; NYSCEF No. 577 at ¶ 4.) So even if this court were to adopt this [*22]interpretation of Matter of Thygesen, it would not help respondent in this proceeding.
Alternatively, one could read Matter of Thygesen's media-reports ruling as holding that information about now-sealed arrests may always be considered, as long as the information is not contained within documents subject to sealing. In that scenario, Matter of Thygesen's conclusion would conflict with the First Department's holding in Matter of Palacio that now-sealed information may not be incorporated into a document that would otherwise be outside the scope of CPL 160.50. (See 13 AD3d at 282.) And in the event of conflict between the First Department and another department of the Appellate Division, this court must follow the First Department. (See D'Alessandro v Carro, 123 AD3d 1, 6 [1st Dept 2014].) On that reading of Matter of Thygesen, its holding would not control this court's analysis.
Unlike the Fourth Department's ruling in Matter of Thygesen, the motion-court decision in Matter of Young is, by definition, not binding on this court.[FN34]
And although the motion-court's analysis of § 160.50 in Matter of Young might be entitled to persuasive force, the court's conclusion there ultimately resolves a materially different question from the one presented in this case.
In Matter of Young, petitioner, employed by New York City as a probationary corrections officer, had been arrested and charged with making a false statement to Nassau County police. (See 68 Misc 3d at 515-516.) While those charges were pending, the City Department of Corrections conducted a review into petitioner's conduct using the Nassau County investigation file (see id. at 516)—as it was entitled to do, pre-sealing. (See Matter of Ono, 12 AD3d at 300.) That review led the Department of Correction's human-resources department to recommend, pre-sealing, that petitioner's probationary employment be terminated, without a hearing, for "conduct unbecoming an officer which led to [petitioner's] arrest by Nassau County Police." (Matter of Young, 68 Misc 3d at 516 [internal quotation marks omitted].) A month after that termination recommendation was issued, petitioner's criminal charges were dismissed and the records sealed. Three weeks after that, the City fired petitioner. Supreme Court, Kings County, rejected petitioner's § 160.50-based challenge to his termination. (See id. at 517-519.)
That ruling is distinguishable here. Petitioners do not dispute that a party may base a determination regarding a formerly accused individual on the underlying conduct for which that individual was arrested, even if the party could not base its determination on the fact of the arrest itself. (See NYSCEF No. 310 at 17; Matter of 53rd St. Rest., 220 AD2d at 588 [explaining that the agency's determination could be based on "independent evidence of the conduct leading to the criminal charges"] [internal quotation marks omitted].) And the motion court in Matter of Young made clear—in four different places in its decision—that it was ruling that the City had been entitled to rely "not on the fact that a person that was arrested, but on the conduct underlying that arrest." (68 Misc 3d at 518; see also id. at 517-518.) In this case, on the other hand, as petitioners emphasize, respondent did not "receive[], review[] or rel[y] on any evidence of Petitioners' conduct in making its determination," but instead "relied entirely on the NYPD's [*23]transmission of the fact of Petitioners' arrests and the alleged location they occurred."[FN35]
(NYSCEF No. 578 at 25 [emphasis omitted].) Matter of Young itself makes clear that reliance only on the fact of a sealed arrest is impermissible.[FN36]
(See id. at 518; cf. Matter of Kenner v Coughlin, 105 AD2d 1130, 1130-1131 [4th Dept 1984] [holding that petitioner's termination from employment did not violate CPL 160.60 because it "was based on acts of recklessness involving a firearm, not on the mere fact of his arrest"].)
CPL 160.50 and 160.60 bar an administrative-hearing body like the UJB from considering or relying on sealed arrest records. By the same token, these sealing statutes bar the UJB from considering or relying on information that is drawn directly from sealed arrest records and reflects only the fact of the arrest.
4. Whether the UJB could consider the fact of petitioners' arrests for the purpose of establishing their presence in Hamilton Hall
Respondent contends that the UJB's consideration of (and reliance on) this arrest-information was nonetheless consistent with CPL 160.50 and 160.60. Respondent argues that the UJB could permissibly take the information into account for the limited purpose of establishing petitioners' identities and their "presence in Hamilton Hall." (See NYSCEF No. 566 at 15 [emphasis in original].) This arrest-related information, respondent says, thus permissibly goes to the conduct underlying petitioners' arrests. (Id.; see also NYSCEF No. 296 at 6; NYSCEF No. 592 at 7.) Petitioner responds that the UJB impermissibly "rel[ied] solely on the sealed arrest itself as proof of that conduct." (NYSCEF No. 578 at 23.) This court agrees with petitioners.
Respondent's only evidence of petitioners' presence in Hamilton Hall—and accordingly of their conduct in occupying Hamilton—was that petitioners had been arrested there. (See NYSCEF No. 577 at ¶ 4; NYSCEF No. 584 at Tr. 75-76; NYSCEF No. 612 at Tr. 4-6, 96-97.) [*24]Respondent is thus arguing that it was permissible to use the fact of petitioners' (sealed) arrests to demonstrate that they had committed arrest-worthy conduct. But the caselaw teaches that proof of wrongful conduct must be something other than the fact of the arrest or dismissed charges themselves. (See Matter of K.C.B. Bakeries, Inc. v Butcher, 144 AD2d 894, 896 [3d Dept 1988] [drawing this distinction]; accord People v Anonymous, 34 NY3d 631, 649 [2020] [vacating a sentence imposed based on a finding that defendant had violated the terms of a plea-bargain, when "the People did not present independent evidence that defendant violated the conditions of his plea, but instead sought to avoid their burden by relying on the contents of the [erroneously] unsealed record."].)
Indeed, § 160.60 provides that upon favorable termination, "the arrest and prosecution shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution." This language, according to the Court of Appeals, "clearly intends that the criminal action and proceedings be treated as if they never occurred—as if they are not part of defendant's past." (Anonymous, 34 NY3d at 637 [2020] [emphasis added].[FN37]
) The UJB could not properly take into account facts established only through evidence of something that never happened. (See id. at 642 [A "sealed record is simply not available for consideration" by a court; "the court cannot rely on it."].)
This principle also defeats respondent's related argument that the UJB properly relied on the incident report because whether petitioners were or were not "arrested on criminal charges is completely immaterial to each of the eight Rules violations for which Petitioners were found responsible." (NYSCEF No. 296 at 6.) It is true that, in the abstract, a student being arrested for a given act is not necessary for that act to constitute one of the charged Rules violations. But in the particular disciplinary proceedings at issue here, the UJB could find that petitioners committed those charged violations only if it had evidence that petitioners were in Hamilton Hall in the first place. (See e.g. NYSCEF No. 318 at 4-6.) And the only record evidence of petitioners' presence in Hamilton Hall was that the NYPD had arrested them there.[FN38]
If, as this court has concluded, the fact of the arrest must be removed from consideration, because the sealing [*25]statutes deem that arrest to have never occurred (see Anonymous, 34 NY3d at 637), the downstream violation determinations resting on that fact are thereby fatally eroded.
It might be true, as respondent contends, that the UJB's disciplinary determinations would have been the same had the NYPD informed respondent that petitioners had been "detained without arrest and released at the scene," rather than that petitioners "were arrested and arraigned." (NYSCEF No. 592 at 7.) But that contention makes no difference. The UJB might not accord greater significance to an interaction between petitioners and with police that led to their formal arrest and prosecution, as opposed to a brief, unrecorded detention and release at the scene. But CPL 160.50 and 160.60 do. These statutes, along with Executive Law § 296 (16), afford protections specifically to those who are arrested and criminally charged and then obtain a favorable termination of those charges. That legislative policy choice is entitled to respect. As applied here, doing so requires a conclusion that the UJB erred in admitting (or considering) the fact of petitioners' arrest.
Respondent claims that ruling for petitioners would undermine CPL 160.50's "anti-stigma and rehabilitative purpose" by indicating to prosecutors that "dismissals [of criminal charges] function as a shield against accountability, thereby incentivizing more aggressive prosecutions of students or, at the very least, keeping their criminal records unsealed." (NYSCEF No. 592 at 8.) But this court's ruling is more narrow. This court has not concluded that "sealing pursuant to CPL § 160.50 automatically bars a private college or university from making use of pre-sealing law enforcement information to identify and discipline students" (id.), as respondent fears. (Id.) Rather, this court holds that a private university may not rely post-sealing on sealed arrest or prosecution-related information, obtained directly from the police, that reflects only the fact of the arrest, as opposed to the underlying conduct that led to the arrest. This court is not persuaded that this narrow—though still meaningful—holding will have the negative policy consequences of which respondent warns. Regardless, this court's conclusion is that construing the scope of the sealing statutes as respondent urges would require rewriting those statutes, rather than applying them as enacted by the Legislature and construed by New York's appellate courts. This court may not take that step in the name of avoiding undesirable practical consequences.
Finally, respondent argues that "accepting Petitioners' arguments here would reward their persistent efforts to evade accountability for their own actions" through alleged concealment of their identities while in Hamilton Hall, "rather than vindicate the interests the sealing statutes are designed to protect." (NYSCEF No. 296 at 9.) Notwithstanding its intuitive appeal, this equities-based argument cannot overcome the dictates of the sealing statutes. The Court of Appeals rejected decades ago the proposition that a court should have "an inherent power to unseal records when justice demands." (Matter of Joseph M. (New York City Bd. of Educ.), 82 NY2d 128, 133 [1993] [internal quotation marks omitted].) And this court may not, in any event, confine the effect of the ruling that respondent seeks—that parties may properly rely on, and introduce as evidence, information reflecting solely the fact of sealed arrests—to cases where the equities might support that result.
The sealing statutes prohibited the UJB from considering the fact of petitioners' sealed arrests for the purpose of establishing a material fact with respect to the charged disciplinary violations—namely, their presence in Hamilton Hall during its occupation.
C. Whether the UJB's Disciplinary Determinations Were Rationally Supported by [*26]the Evidence Absent the Fact of Petitioners' Arrests
For the reasons set forth in Section II.B, supra, this court concludes that the UJB's post-sealing consideration of the fact of petitioners' sealed arrests, as reflected in the Department of Public Safety incident report, was contrary to law. The UJB's improper consideration of sealed information reflecting the fact of petitioners' arrests does not, of its own force, require annulment of the challenged disciplinary determinations. (See Matter of Charles Q. v Constantine, 85 NY2d 571, 575 [1995] ["[T]he mere reception of erroneously unsealed evidence at petitioner's disciplinary hearing does not, without more, require annulment of respondent's determination.") But the UJB's determinations still had to rest on evidence, beyond the fact that petitioners had been arrested, from which it could rationally conclude that petitioners were in Hamilton Hall while it was occupied. (See Matter of 53rd St. Rest., 220 AD2d at 588 [sustaining determination because it was supported by substantial evidence independent of the testimony that had impermissibly drawn on sealed records]; Matter of Lacey v Coughlin, 97 AD2d 824, 825 [2d Dept 1983] [holding that petitioner's termination was improper because "absent a consideration of the arrest, the totality of the record was insufficient to support a finding that the petitioner's performance was not satisfactory so as to justify his discharge"].) That additional evidence was lacking here. (See NYSCEF No. 612 at Tr. 96-97.)
Without that foundational evidentiary support, no admissible evidence supports a conclusion that any petitioner was even present in Hamilton Hall while it was occupied. And if the UJB lacked a basis to conclude that petitioners were in Hamilton during its occupation, the UJB necessarily lacked a basis to determine that petitioners had committed, or participated in the commission of, the occupation-related Rules violations for which they were found responsible. As a result, the UJB's violation determinations were not rationally based on the admissible evidence before it, as required for those determinations to be sustainable on review under CPLR 7803. (See Matter of Warner v Elmira College, 59 AD3d 909, 909 [3d Dept 2009] [explaining that in an article 78 challenge to university disciplinary determination, the determination cannot be sustained if it is not "rationally based upon the evidence" before the university decisionmaker].) Those determinations were arbitrary and capricious.[FN39]

III. The Challenge to the Sufficiency of the Evidence
Petitioners next argue that even setting aside the admissibility of sealed arrest-related information, the disciplinary determinations against them lacked a sufficient evidentiary foundation. (See NYSCEF No. 310 at 25-29; NYSCEF No. 578 at 32-34.) This court agrees.
The court could resolve the current proceeding without reaching this sufficiency challenge to the underlying disciplinary determinations, given the sealing-related ruling in Point II, supra. But whether the sealed information, in addition to the other evidence before the UJB, would be sufficient to support the challenged determinations is a significant issue that the parties have extensively briefed and argued. This court concludes that the better course—for the benefit [*27]of the parties and any reviewing court—is to address the issue fully here.
In considering an article 78 arbitrary-and-capricious challenge to the sufficiency of the evidence supporting a university disciplinary determination, a court must confirm the determination if it "was based on a rational interpretation of the relevant evidence." (Matter of Katz v New York Univ., 95 AD3d 547, 547 [1st Dept 2012], citing Matter of Katz v Board of Regents of the Univ. of the State of NY, 85 AD3d 1277, 1279 [3d Dept 2011].) As respondent emphasizes (see NYSCEF No. 566 at 8-9), this review is necessarily deferential. But deferential is not illusory. (See e.g. Matter of Warner, 59 AD3d at 909 [reversing judgment below and annulling disciplinary determination as "not rationally based upon" the evidence]; Matter of Basile v Albany Coll. of Pharm. of Union Univ., 279 AD2d 770, 771-772 [3d Dept 2001] [same].) On considering the then-applicable disciplinary rules governing the charged conduct (and guidelines enacted to construe those rules), this court agrees with petitioners that the evidence before the UJB was insufficient to support several (but not all) of respondent's disciplinary-violation determinations. Those determinations would still be arbitrary and capricious even if one were to assume that the sealed arrest-related evidence discussed in Point II, supra, was properly before the UJB.
A. Construing the Applicable University Rules and Guidelines
Petitioners' sufficiency-based challenge turns heavily on the contours of respondent's then-applicable disciplinary rules.[FN40]
 (See NYSCEF No. 578 at 33.) This court therefore begins by considering the scope of those rules; and what conduct the rules do—and do not—prohibit.
Petitioners were charged with violating provisions of the Rules of University Conduct. Rule 443 of those Rules identifies 20 forbidden forms of conduct. (See NYSCEF No. 568 at 5-7.) Under this provision, a person violates the Rules when that person "individually or with a group, incident to a demonstration, including a rally or picketing," engages in one of the 20 forbidden acts. (Id. at 6.)
The parties hotly dispute what evidence is needed to show that a person engaged in proscribed acts "with a group" under the Rules. (Compare NYSCEF No. 566 at 22-24 and NYSCEF No. 612 at Tr. 58-59 [respondent], with NYSCEF No. 578 at 32-34 [petitioners].) In answering this question, this court takes into account interpretive "Guidelines to the Rules of University Conduct," promulgated by the Columbia University Senate. According to the parties' briefing and presentations at oral argument, the relationship between the Guidelines and the Rules they interpret is akin to that between regulations implementing a given statute and the statute itself. If a Guideline is inconsistent with the Rules, respondent (and, for that matter, this court) will treat them as having no effect. Otherwise, each Guideline authoritatively construes the Rule(s) to which it pertains.[FN41]

In August 2024—after the occupation of Hamilton Hall but before respondent brought the underlying disciplinary proceedings against petitioners—the University Senate enacted revisions to the Guidelines as part of a regular quadrennial review/revision process. (See NYSCEF No. 569 at 3 [Guidelines as revised].) The revised Guidelines specify that for purposes of the violations defined in Rule 443, "[a] group may not be sanctioned for the behavior of an individual, and individuals alleged to have violated the Rules shall be charged for their individual actions based on available evidence, not the actions taken by others in a larger group." (Id. at 6.)
It is undisputed by the parties that this version of the Guidelines, as the version in effect when respondent brought disciplinary proceedings against petitioners, governed those proceedings to the extent applicable. And respondent has not contended in briefing or oral argument in this proceeding that the Guidelines language quoted in the preceding paragraph is inconsistent with Rule 443. Respondent has argued that "the [G]uidelines in combination with the [R]ules were properly applied in the proceedings." (NYSCEF No. 290 at Tr. 66 [transcript of oral argument on petitioner's request for an interim stay].)
This court turns next, therefore, to the UJB's explanation of how it applied the August 2024 Guidelines, in conjunction with the Rules, in assessing the evidence with respect to each charged violation.[FN42]

The UJB explained in its disciplinary determinations that it was "persuaded . . . that attempts to conceal one's identity when acting as part of a group should not absolve individual participants of responsibility." (NYSCEF No. 318 at 2.)[FN43]
That is, if the "evidence is sufficient to show that a respondent was present at Hamilton Hall during the occupation, the individual was part of the group occupying the building." (Id. at 2-3.) And because "the violations in question could not have been achieved without the presence of a substantial number of participants, individuals who contributed their presence are responsible for the Rules violations that the group committed." (Id. at 3 [emphasis added].)
Petitioners argue that the UJB's conclusion on this point misreads the Rules and Guidelines, read together. (See NYSCEF No. 310 at 25-26; NYSCEF No. 578 at 32-34.) This [*28]court agrees.
The UJB held that evidence of an individual's presence in a group, coupled with evidence of Rules violations committed by the group as a whole, may establish that the individual committed those violations. But the Guidelines foreclose just that inferential leap. The Guidelines provide that evidence of "the actions taken by others in a larger group" will not suffice to show that an individual committed Rules violations "with a group," absent a showing that his or her own "individual actions" as part of the group violated the applicable Rules. (NYSCEF No. 569 at 6.) This Guidelines language necessarily presupposes that an individual's "contribut[ing] their presence" to the group (NYSCEF No. 318 at 3) is insufficient, standing alone, to establish that the individual should be held responsible for the group's conduct. The UJB's contrary interpretation renders meaningless this aspect of the Guidelines.
Respondent, in defending some of the UJB's violation determinations, contends that evidence of petitioners' being in the group occupying Hamilton Hall is sufficient to support Rules violations "regardless of any particular actions individual Petitioners may have taken" while in that group. (NYSCEF No. 566 at 23 [emphasis added]; see also id. [arguing that each petitioner could properly be held responsible for "endangering University property on a University facility," regardless whether "any particular Petitioner personally smashed windows or affixed locks" in Hamilton] [internal quotation marks and alterations omitted].)
Similarly, at oral argument, respondent's counsel defended the UJB's determination on the ground that because "certain activity took place and required a large group to achieve[,] . . . the actions of that group can be attributed to [an] individual because they were acting as part of the group." (NYSCEF No. 290 at Tr. 75; see also NYSCEF No. 612 at Tr. 53-56 [same].) And respondent's counsel expressly conceded at argument that "[w]e don't know" what each petitioner "individually did inside the building . . . because they were wearing masks and they covered the cameras"—but that it was still "not arbitrary or irrational for the UJB" to find petitioners responsible for the charged violations because they were "part of that group effort" to occupy Hamilton Hall. (NYSCEF No. 612 at Tr. 58, 59.)
Again, though, the Guidelines require proof of an individual's own wrongful conduct before the UJB may find that individual responsible for a charged violation.[FN44]
The question before the UJB under the Guidelines, therefore, was not what actions had been taken by those occupying Hamilton Hall in the aggregate. It was whether each petitioner individually [*29]contributed to that aggregate, and how those individual contributions violated the Rules of University Conduct (or not).
Respondent argues that it would be inappropriate for this court to reject the UJB's (and respondent's) reading of the Rules and Guidelines, because this court should not "substitute its own interpretation of the Rules (and their relationship to the interpretive guidelines) for the University's." (NYSCEF No. 566 at 22.) The court disagrees with this argument. It is true, as respondent points out, that this court must afford deference to a university's interpretation and application of its policies. (See id., citing Matter of Hansbrough v College of St. Rose, 209 AD3d 1168, 1171 [3d Dept 2022]; NYSCEF No. 290 at Tr. 65.) Nonetheless, occasions will arise in which—as here—a university's interpretation is unpersuasive even when evaluated deferentially.
Indeed, the UJB itself framed its reading of the Rules as based on broader pragmatic considerations rather than the language of the Rules and Guidelines themselves—the need to avoid "absolv[ing] individual participants of responsibility" based on their concealing their identities. (NYSCEF No. 318 at 2.) This court recognizes the difficulty respondent faced in assigning responsibility for wrongdoing to individuals who systematically wore masks to prevent onlookers from knowing who was doing what during the occupation of Hamilton Hall—and the possibility that this difficulty could lead "to under-sanctioning individuals for their possible actions." (NYSCEF No. 290 at Tr. 72.) But respondent may not overcome this difficulty by reading the Rules and Guidelines in a way their language cannot support. The Rules, as construed authoritatively by the Guidelines, forbid the UJB from imposing sanctions on individuals based only on their presence in Hamilton Hall, absent evidence that their particular "individual actions" while in Hamilton Hall violated the Rules. (NYSCEF No. 569 at 6.)
B. Applying the Rules and Guidelines, as Construed
The next question is whether, under the Rules and Guidelines as construed in Section III.A, supra, the evidence rationally supports the UJB's violation findings on a charge-by-charge basis.[FN45]
This court concludes that the evidence supports the UJB's findings with respect to some, but not all, of the charges.
Charge 1 (violation of Rule 443 [1], "engages in conduct that places another in danger of bodily harm"):[FN46]
The evidence does not rationally support the UJB's finding that petitioners are responsible for this charged violation. The UJB's stated basis for its responsibility finding is that petitioners were "present in a group which caused chaos and disorder within [*30]Hamilton Hall," and thereby "contributed to a climate in which serious bodily harm could have occurred." (NYSCEF No. 318 at 4.) But the conduct of other group members cannot support a ruling holding petitioners responsible for the charged violation, for the reasons discussed in Section III.A, supra. And the record does not contain evidence that petitioners themselves individually engaged in conduct that placed others in danger of bodily harm. Without evidence of that kind, no rational decisionmaker could find petitioners responsible on this charge by a preponderance of the evidence.
Charge 2 (violation of Rule 443 [5], "endangers property on a University facility"): The evidence does not rationally support the UJB's finding that petitioners are responsible for this charged violation. The basis given for this finding is that petitioners were "present in a group that occupied the facility," namely Hamilton Hall; and that the group's conduct in "br[eaking] windows and furniture[] and barricad[ing] themselves in the building" endangered University property. (Id.) The record did not, however, contain evidence that petitioners themselves acted to endanger Hamilton Hall or University property within Hamilton. (Cf. NYSCEF No. 612 at Tr. 58-59 [in which respondent's counsel argues that petitioners could properly be held responsible for the charged disciplinary violations "whether or not they moved the vending machine or broke the window or took the lock out" while in Hamilton].) Without that evidence, no rational decisionmaker could find petitioners responsible on this charge by a preponderance, for the same reason as on Charge 1.
Charge 3 (violation of Rule 443 [6], "misappropriates . . . property belonging to the University): The evidence does not rationally support the UJB's finding that petitioners are responsible for this charged violation. The UJB found that "by being present and part of a group occupying Hamilton Hall," petitioners enabled the "misappropriat[ion] of Hamilton Hall, which itself constitutes University property," thereby both "threaten[ing] and caus[ing] substantial financial loss." (NYSCEF No. 318 at 4-5.) This paragraph, however, provides that it applies when an individual "misappropriates . . . books or scholarly material or any other property belonging to the University, or to another party, when that property is in or on a University facility," and thereby causes or threatens to cause substantial loss. (NYSCEF No. 568 at 6.) It encompasses misappropriation of property, particularly movable property, that is "in or on a University facility." Conversely, the paragraph does not apply to misappropriation of a University facility itself—e.g., Hamilton Hall.
The UJB had before it arrest-related evidence that petitioners were present in Hamilton.[FN47]
But that evidence could not support a finding that petitioners violated Rule 443 (6) in misappropriating Hamilton Hall itself. And the record before the UJB did not contain evidence that petitioners individually misappropriated property within Hamilton. Absent that evidence, no rational decisionmaker could find by a preponderance that petitioners were responsible on this charge.
Charge 4 (violation of Rule 443 [7], "interferes over a short period of time with entrance to, exit from, passage within, or use of, a University facility"): The evidence rationally supports the UJB's finding that petitioners are responsible for this charged violation. The UJB found that the "very purpose of the demonstration was to interfere with the use of a [*31]University facility" and that petitioners' "presence contributed to impeding the use of the facility." (NYSCEF No. 318 at 5.) Unlike Charges 1 and 2, the UJB could rationally find that each petitioner's presence in Hamilton Hall itself was the individual action that constituted a violation. Thus, if the arrest-related evidence of petitioners' presence in Hamilton were admissible, the UJB's determination that petitioners violated Rule 443 [7] would be sustained and petitioners' challenge to that determination would fail.
Charge 5 (violation of Rule 443 [8], "continues for more than a very short period of time to physically prevent, or clearly attempt to prevent, passage within, or unimpeded use of, a University facility, and thereby interferes with the normal conduct of a University function"): The evidence rationally supports the UJB's finding that petitioners are responsible for this charged violation, largely for the same reasons as Charge 4. With respect to the added durational/interference requirements, the UJB could rationally find that those requirements were satisfied by the 22-hour-long occupation of Hamilton Hall. If the evidence of petitioners' presence in Hamilton during its occupation were admissible, the violation determination on this charge would be sustained.
Charge 6 (violation of Rule 443 [9], "enters or remains in a University facility without authorization at a time after the facility has been declared closed by the University"): The evidence rationally supports the UJB's finding that petitioners are responsible for this charged violation in light of the fact of their arrests in Hamilton Hall, showing that they were in the building during its occupation. The determination on this charge rises or falls with the admissibility of the evidence of petitioners' presence in Hamilton, for the same reasons as Charges 4 and 5.
Charge 10 (violation of Rule 443 [13], "briefly interrupts a University function"): The UJB found that by being present in the group, petitioners contributed to the occupation of Hamilton Hall, "thus caus[ing] the disruption of normal University functions for a substantial period of time." (NYSCEF No. 318 at 6.) This finding does not, however, identify which University functions it is referencing. To the extent that the UJB found that petitioners are responsible on this charge for disrupting University functions beyond the use of Hamilton Hall itself, the finding lacks rational support in the record. The UJB's determination does not identify any fact showing that petitioners, merely by being present in Hamilton Hall, disrupted University functions more broadly.
To the extent that the UJB found that petitioners are responsible on this charge for disrupting University functions in Hamilton Hall itself, that finding has rational support in the record; but it impermissibly duplicates the UJB's determination on Charge 5. Both charges allege that petitioners disrupted a University function; and both violation determinations rest on evidence that this disruption stemmed from petitioners' improper presence in Hamilton Hall, preventing its normal use by students and faculty. And the UJB does not explain how its rulings on Charges 5 and 10 might be distinguished from one another. The ruling on this charge is therefore arbitrary and capricious. (See Matter of Graham v New Hampton Fire Dist., 131 AD3d 1168, 1169 [2d Dept 2015] [annulling a misconduct determination on one disciplinary specification as duplicative of the misconduct determination on another specification].)[FN48]

Charge 11 (violation of Rule 443 [14], "disrupts a University function or renders its continuation impossible"): The evidence does not rationally support the UJB's finding that petitioners are responsible for this charged violation. The UJB held that "the behavior of the group, in occupying Hamilton Hall, created a disruption to multiple University functions," and that because petitioners were present in Hamilton, they "contributed to the group activity by [their] presence." (NYSCEF No. 318 at 6.) But neither the UJB nor respondent in this proceeding identified record evidence that petitioners themselves individually engaged in the disruptive behavior referenced in the ruling on this charge. Without evidence of that individual (mis)conduct, no rational decisionmaker could find petitioners responsible on Charge 11 by a preponderance.
IV. Resolution of the Petition
This court holds in Point II that the UJB's violation determinations are arbitrary and capricious, because a necessary element of those determinations (petitioners' presence in Hamilton Hall) is supported only by inadmissible evidence (sealed arrest-related information). In the alternative, this court holds in Point III that even assuming the evidence discussed in Point III were admissible, the UJB's findings on Charges 1, 2, 3, 10, and 11 would still be subject to annulment as arbitrary and capricious; those findings either lack rational support in the record or are duplicative.
As a result, the sanctions imposed by respondent cannot stand. That is true either because no violations remain to support sanctions (under Point II); or because the sanctions would need to be considered anew in light of this court's annulment in part of the UJB's violation determinations (under Point III). (See Matter of Gillen v Smithtown Library Bd. of Trustees, 94 NY2d 776, 778 [1999] [explaining that because a "reviewing court generally will not presume to determine the precise sanction to be imposed," when "several charges have been dismissed on appeal, an appellate court will often remit the matter" to the administrative decisionmaker to determine "an appropriate penalty"] [internal quotation marks omitted].) This court therefore does not reach the parties' arguments in this proceeding about whether the sanctions imposed by the UJB on petitioners are procedurally improper, have been improperly influenced by the Trump Administration in violation of the First Amendment, or, under Matter of Storino v New York University (193 AD3d 436, 439 [1st Dept 2021]), are so excessive as to "shock[] . . . one's sense of fairness.")
Given these conclusions, the question arises of how to proceed, going forward, with respect to the underlying disciplinary proceedings. Petitioners urge that, as in Matter of Machosky, the court should grant the petition and dismiss the underlying disciplinary charges outright. (See NYSCEF No. 612 at Tr. 69, citing 145 Misc 2d at 217.) This court declines to go that far. True, this court has held that the particular evidence used by respondent to prove petitioners' presence in Hamilton Hall was inadmissible. Petitioners have not shown, however, that respondent will necessarily be unable to adduce other evidence of petitioners' presence (and conduct) in Hamilton Hall, if afforded the opportunity. Although, as petitioners emphasize (see [*32]id. at Tr. 69-70), substantial time has elapsed since the occupation of Hamilton occurred, the court is not persuaded that the delay warrants dismissing the disciplinary charges altogether. That is particularly true given the disruptions and other harms to the Columbia University community that resulted from the occupation—and respondent's interest in obtaining redress from any individual affiliated with Columbia who broke the university's Rules by inflicting those harms.
This court determines, therefore, that the most appropriate course, upon annulling the challenged disciplinary determinations and sanctions, is to remand to respondent for further proceedings, should respondent choose to pursue further those proceedings against petitioners.
As noted above (see note 3, supra), the framework governing disciplinary proceedings for alleged violations of the Rules of University Conduct—including the selection and composition of the body tasked with adjudicating disciplinary charges—has changed substantially since the commencement of the disciplinary proceedings at issue. Petitioners argue that this court should direct that any further proceedings by respondent must be conducted and determined under the previous framework. (See NYSCEF No. 612 at Tr. 78-79.) But as this court noted during oral argument (see id. at Tr. 79), the court is unaware of authority permitting it to require respondent on remand to employ disciplinary procedures no longer in effect as of the time of the court's ruling.[FN49]
The court declines petitioners' request to innovate.
The court recognizes that respondent, should it decide to appeal this order, will likely seek a stay of the order pending appeal. To afford time for any stay application to be brought and considered in an orderly fashion, this court stays its rulings in this order until 30 days from entry of the order.
Accordingly, it is
ORDERED that respondent's motion to dismiss the CPLR article 78 petition (mot seq 003) is denied; and it is further
ORDERED that petitioners' request for judgment in their favor on the CPLR article 78 petition (mot seq 002) is granted only to the following extent, and otherwise denied:
Effective 30 days from entry of this order, and subject to any further order of this court or of the Appellate Division,(i) It is ORDERED, ADJUDGED, AND DECLARED that respondent's determinations that petitioners are responsible for violations of the Columbia University Rules of University Conduct for their alleged participation in the April 30, 2024, occupation of Hamilton Hall are arbitrary and capricious,(ii) It is ORDERED that these determinations are vacated and remanded to respondent for further proceedings consistent with this order; and(iii) It is ORDERED that the sanctions imposed by respondent against petitioners based on these determinations are vacated;
and it is furtherORDERED that petitioners serve a copy of this order with notice of its entry on respondent; and on the office of the County Clerk (using the NYSCEF document type "Notice to the County Clerk - CPLR § 8019 (c)"), which shall enter judgment accordingly.
DATE 2/27/2026GERALD LEBOVITS, J.S.C.

Footnotes

Footnote 1:Except as otherwise noted, this description draws from an internal Columbia report, appearing at NYSCEF No. 309 (and its exhibits), the facts of which petitioners have not disputed.

Footnote 2:See Complaint at ¶¶ 4-5, 106-131, Torres v Carlson, Dkt. No. 25-cv-3474 (SD NY Apr. 25, 2025). This court may take judicial notice that the janitors made these allegations in federal-court filings. (See RGH Liquidating Trust v Deloitte & Touche LLP, 71 AD3d 198, 207 [1st Dept 2009], revd on other grounds 17 NY3d 397 [2011].)

Footnote 3:While the disciplinary proceedings were ongoing, respondent made substantial (prospective) changes to the process for hearing and adjudicating complaints of violations of the Rules of University Conduct. (See NYSCEF No. 581 at 1 [describing some of those changes].) Those changes to the Rules process do not affect this court's evaluation of whether the disciplinary determinations rendered against petitioners should be sustained, annulled, or vacated.

Footnote 4:The Rules of University Conduct compose Chapter XLIV of the Statutes of Columbia University, as those Statutes existed at the time of the challenged determinations. (See NYSCEF No. 568 at 3 [Rule 440].) As a formal matter, therefore, "Rule 452 [c]" was § 452 [c] of the university's Statutes. For convenience, this decision refers to Rule 440, Rule 442, Rule 452, and so on.

Footnote 5:An unredacted version of the incident report appears under seal at NYSCEF No. 11.

Footnote 6:Notwithstanding the sealing of petitioners' arrest and prosecution records, the Rules Administrator's investigative files for each petitioner included screenshots of the Criminal Court docket from each now-sealed prosecution, until a Columbia Law School professor wrote to the Rules Administrator that retaining those screenshots as part of the investigation violated the sealing provisions of CPL 160.50. (See NYSCEF No. 559 at ¶ 59; see also NYSCEF No. 534 at 61-63 [copy of letter, filed in this proceeding under seal].)

Footnote 7:Three weeks before the start of the UJB hearings in petitioners' respective disciplinary proceedings, the same Columbia Law School professor wrote a four-page letter to the UJB, warning them that use or consideration of the Department of Public Safety incident report in those proceedings would violate CPL 160.50. (See NYSCEF No. 401 [copy of letter, filed in this proceeding under seal].)

Footnote 8:The UJB determination refers at page 3 to "Exhibit B" as the evidence "indicat[ing] the respondent's presence in Hamilton Hall." That reference is to Exhibit B of the Rules Administrator's investigation report. Exhibit B is a copy of the incident report. (See NYSCEF No. 309 at 2-3 [report with redactions]; id. at 12-35 [redacted version of Exhibit B].)

Footnote 9:The undersigned has served as a Columbia Law School adjunct professor since 2010. Because the undersigned is an adjunct only at the law school, he is not required to recuse from matters, like this one, that involve the university affiliated with the law school (See Advisory Comm on Jud Ethics Op 25-136 [2025].) In the interests of transparency, the undersigned informed counsel for the parties of his Columbia-related teaching experience and asked whether either petitioners or respondent intended to move to recuse in light of that connection. (See NYSCEF No. 290 at Tr. 4 [transcript of July 17, 2025, oral argument].) Counsel for petitioners and for respondent each told the undersigned that they did not intend to seek recusal. (See id. at 5.) The undersigned has therefore continued to preside over this proceeding.

Footnote 10:Petitioners are therefore described in the caption (and this decision) as J. Doe 1, J. Doe 2, and so on.

Footnote 11:An exception to this principle exists when a student "meet[]s the threshold requirement of showing that the State somehow involved itself in what would otherwise be deemed private activity." (Matter of Mu Ch. of Delta Kappa Epsilon, 176 AD2d at 13 [internal quotation marks omitted].) This exception applies, in other words, if the private disciplinary determination is considered State action for due-process purposes. (See Matter of Stone v Cornell Univ., 126 AD2d 816, 818 [3d Dept 1987], citing Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 157 [1978].) Petitioners contend that the severity of the disciplinary sanctions imposed by respondent was unduly influenced by pressure from the Trump Administration, and thereby constituted state action. (See NYSCEF No. 578 at 36-38.) Petitioners do not, however, argue (and this court would be skeptical of concluding) that the disciplinary proceeding itself constituted state action, such that constitutional due-process protections attached prior to the UJB's determination.

Footnote 12:It is undisputed that the UJB hearing panel(s) did not issue written extensions of the Rule 446 timeframes. (See NYSCEF No. 584 at Tr. 36-37, 49 [transcript of Nov. 13, 2025, oral argument].)

Footnote 13:Petitioners appear to suggest that they were prejudiced by the length of the challenged disciplinary proceedings because they "registered, paid for, and attended classes for two semesters before Respondent imposed draconian sanctions rendering their substantial investment of time, effort and money at a critical juncture in their lives utterly wasted." (NYSCEF No. 578 at 30 [emphasis omitted], citing Matter of Ryan v Hofstra Univ., 67 Misc 2d 651, 660-662 [Sup Ct, Nassau County 1971]; Matter of Machosky v State Univ. of NY at Oswego, 145 Misc 2d 210, 215-216 [Sup Ct, Oswego County 1989].) This suggestion is unpersuasive. These decisions themselves reflect that prejudice, in this context, lies in harm to a student's ability to contest meaningfully, or obtain full review of, disciplinary charges or sanctions. Petitioners here do not allege that they suffered effectively unreviewable punishment as a result of the delays of which they now complain. Nor have they alleged that they suffered harm to their ability to defend themselves against the disciplinary charges at issue.

Footnote 14:The petition suggests that considering evidence from sealed arrest records in contravention of the sealing statutes would alone render arbitrary and capricious the disciplinary determinations rendered by respondent. (See NYSCEF No. 559 at ¶ 174.) This suggestion is without merit. The "mere reception of erroneously unsealed evidence at petitioner's disciplinary hearing does not, without more, require annulment of respondent's determination." (Matter of Charles Q. v Constantine, 85 NY2d 571, 575 [1995].) If petitioners were pursuing a challenge based only on the erroneous admission of evidence, they would need to show that "the admission of the erroneously unsealed evidence operated to deprive [them] of a fair hearing." (Id.) Petitioners do not try to make out that showing here. This court is skeptical in any event that they could do so.

Footnote 15:Respondent argues that a memorandum of Governor Hugh Carey, explaining his veto of an earlier version of a sealing law, shows that § 160.50 permits private parties to continue to have access to and use of arrest/prosecution records even after favorable termination. (See NYSCEF No. 592 at 3, citing NYSCEF No. 597 at 339 [internal pagination].) But the context of that memorandum undermines respondent's argument. Unlike CPL § 160.50 as enacted, the earlier, vetoed bill sought to accomplish its purpose by providing for the physical destruction, not simply sealing, of arrest/prosecution records on file with specific enumerated entities, following favorable termination. (See NYSCEF No. 597 at 338-339.) In vetoing the bill, Governor Carey explained that this approach was both over-inclusive and under-inclusive: It would require the "wholesale destruction" of a "vast amount of documents," many of which might well be needed later by the government, the courts, and defendants; and it would do nothing about records in the hands of entities other than those specifically enumerated. (See id. at 339.) Section 160.50 is different. By ordering the sealing of arrest/prosecution records, not their destruction, § 160.50 preserves the records themselves for later use (if statutorily permitted). And the sealing directive itself also serves to bar the post-sealing use of sealed records by entities beyond those listed in the statute, as respondent itself acknowledges with respect to public actors. The inference that respondent seeks to draw from Governor Carey's veto memorandum is unpersuasive.

Footnote 16:Section 160.60 provides that any exception to the sweeping effect of its language must be specifically provided for by statute or an order "of a superior court"—i.e., Supreme Court or County Court. (See CPL § 10.10 [2].)

Footnote 17:As discussed in Paragraph II.B.1.a, supra, appellate decisions treat § 160.50 as affording an evidentiary privilege in litigation between private parties. The cases characterizing § 160.50 as an evidentiary privilege do not mention Executive Law § 296 (16). Nor do the cases suggest that their analysis of the § 160.50 privilege (or its waiver) is affected by whether the party asserting the protections of § 160.50 could have brought an Executive Law § 296 (16) damages action against the party's adversary.

Footnote 18:For this reason, this court is skeptical of petitioners' argument that courts should imply a private right of action for damages to enforce CPL 160.50 and 160.60 against private parties. (See NYSCEF No. 578 at 17-20.) As petitioners point out, though, this court need not "find a private right of action" to enforce these statutes before concluding, in the context of CPLR article 78 review, that the UJB's "rel[iance] on the sealed arrest information" was an error of law. (Id. at 20.)

Footnote 19:This court is unpersuaded by respondent's contention that because the Legislature has declined to amend Executive Law § 296 (16) to extend its protections to higher-education-related decisions, CPL § 160.50 should not be understood to restrict a private university's use of sealed records. (See NYSCEF No. 592 at 3-4.) The scope of CPL § 160.50's protections for sealed records is analytically distinct from the extent to which those protections may be enforced in a damages action under Executive Law § 296 (16) and § 298.

Footnote 20:Respondent suggests that 230 W 140 is distinguishable as having addressed a request to unseal records sealed under § 160.50. (See NYSCEF No. 296 at 2.) This proffered ground for distinction is unavailing. In 230 W 140, the motion before the court was to preclude introducing sealed records and to strike any reference by landlord to those records. (See 2016 NY Slip Op 51037[U], at *1.) In considering that motion, the court issued a two-part ruling: (i) No basis existed to unseal the records for purposes of the pending eviction proceeding; and (ii) because the records were sealed, landlord could not introduce them or refer to them in the proceeding. (See id. at *2.) The latter aspect of the court's ruling is directly on point here.

Footnote 21:The First Department held in People v F.B. that the Court of Appeals's analysis of CPL 160.50 should also apply to CPL 160.55, which governs the sealing of arrest/prosecution records relating to convictions for petty offenses). (See 155 AD3d at 6, citing Matter of Katherine B. v Cataldo, 5 NY3d 196, 200 n 3 [2005] [explaining relationship between §§ 160.50 and 160.55].)

Footnote 22:In People v F.B., prosecutors brought the motion at issue after a Housing Court judge in the underlying eviction proceeding had granted the tenants' motion to strike sealed records introduced by the landlord. (See 155 AD3d at 3-4.) Respondent's attempt to distinguish F.B. on the ground that it addressed only an unsealing request is thus unavailing. (See NYSCEF No. 296 at 2.) Similarly, the prosecution in Canales brought the unsealing application after tenant's counsel in Housing Court had moved to strike the sealed documents (which the landlord had attached to the eviction petition). (See 174 Misc 2d at 388-389.)

Footnote 23:DRL § 235 (1) does not expressly address the admissibility of the information to which it restricts access. (Compare Social Services Law § 422 [5] [b] [providing that but for a few enumerated exceptions, reports of child abuse or neglect that have been sealed as unfounded "shall not be admissible in any judicial or administrative proceeding"].) Cases interpreting DRL § 235 (1) are instructive in interpreting CPL 160.50 and 160.60, which also do not discuss whether sealed information is admissible in later proceedings.

Footnote 24:This court has not found instances from other sealing statutes in which a court has permitted a third party in lawful possession of sealed records to make post-sealing use of those records in an unrelated proceeding.

Footnote 25:The sole exception to this principle is the unusual circumstance in which "the admission of the erroneously unsealed evidence operate[s] to deprive petitioner of a fair hearing." (Matter of Charles Q., 85 NY2d at 575.)

Footnote 26:Respondent asserts that recent legislative history has "made clear that CPL § 160.50 does not govern the use of sealed records obtained by a private party before sealing, as opposed to simply imposing a sealing obligation on certain government entities." (NYSCEF No. 592 at 3.) This assertion overstates the legislative record. Respondent points out that the Legislature did not enact bills introduced in several legislative sessions that would expressly prohibit post-sealing use of sealed records, and would apply that prohibition regardless whether the records were obtained pre-sealing. (See id.) But "[l]egislative inaction, because of its inherent ambiguity, affords the most dubious foundation for drawing positive inferences." (Clark v Cuomo, 66 NY2d 185, 190-191 [1985] [internal quotation marks omitted].) That is particularly true here when, at most, the Legislature merely failed to act on a bill introduced in the Assembly in successive legislative sessions by a single legislator (or sometimes two legislators). (See Flanagan v Mount Eden Gen. Hosp., 24 NY 427, 432-433 [1969] [discussing the relevance of the extent of legislative consideration of unenacted legislation]; see also NYSCEF No. 592 at 3 & n 2 [linking bill-status information].) The current context also does not present a scenario in which legislative inaction is more probative than it otherwise would be, due to its "continu[ing] in the face of a prevailing statutory construction." (Anonymous, 34 NY3d at 644.) Rather, the courts have consistently interpreted § 160.50 to prohibit post-sealing use of sealed records. (See e.g. Matter of Property Clerk of NY City Police Dept. v Taylor, 237 AD2d 119, 120 [1st Dept 1997] [holding that a chemist could not testify at a civil-forfeiture hearing based on her review of sealed records].) The record is thus also consistent with an inference that the Legislature's inaction on these bills reflected a judgment that the bills were unnecessary and redundant of the existing prohibition on post-sealing use of sealed records—as opposed to a judgment that these uses should be permitted. (See NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 184 [2016] [noting this ambiguity as a reason to decline to treat legislative inaction as probative].)

Footnote 27:Respondent misplaces its reliance on administrative decisions rendered by New York City's Office of Administrative Trials and Hearings (OATH). (See NYSCEF No. 592 at 4, citing Matter of Fire Dept. v Murray, OATH Index No. 2316/13, 2013 NY OATH LEXIS 246 [NYC Off. of Admin. Trials & Hearings, Sept. 25, 2013].) Matter of Murray and other decisions like it do not hold that an agency may rely, post-sealing, on sealed arrest-related records, so long as those records were in the agency's possession pre-sealing. (See Matter of Murray, 2013 NY OATH LEXIS 246, at *3-5; Matter of Department of Corr. v Blanc, OATH Index No. 2571/11, 2011 NY OATH LEXIS 279, at *7-17 [NYC Off. of Admin. Trials & Hearings, Sept. 12, 2011]; accord Matter of Office of Chief Med. Examiner v Rheams, OATH Index No. 262/25, 2025 NY OATH LEXIS 256, at *3-4 [NYC Off. of Admin. Trials & Hearings, Apr. 11, 2025], rejected in part on other grounds by appended Commr. Dec.) This line of OATH decisions holds merely that sealed arrest-related information may be considered if it was incorporated pre-sealing into documents not subject to sealing. (See id.) But given that the Appellate Division decisions in Matter of Palacio and Matter of Burr treat sealed information identically to sealed records, the distinction between the two drawn by the OATH rulings is untenable. This court declines to give those decisions persuasive weight.

Footnote 28:The statute at issue in Matter of Ithaca Journal News was the ancestor of what is now CPL 720.15 (providing for the sealing of accusatory instruments at the time of their filing). As discussed in Paragraph II.B.1.a, supra, CPL 160.50 is analogous to CPL 720.35 (providing for the post-adjudication sealing of court records generated and kept in the course of a prosecution of a defendant who has been adjudicated to be a youthful offender).

Footnote 29:DOCS had learned of those sealed arrests from its review of a copy of the inmate's criminal-arrest history that DOCS had obtained from the State Department of Criminal Justice Services. (See Matter of Burr, 283 AD2d at 892.) The Appellate Division held that CPL 160.50 required DOCS to remove references to the sealed arrests from all records in DOCS's possession (including, presumably, DOCS's copy of the DCJS criminal-arrest history). (See id. at 893.)

Footnote 30:At oral argument, respondent sought to distinguish Matter of Palacio on the grounds that (i) in that case it was "the government taking an action" to use the records, rather than "a third party" like respondent; and (ii) respondent "is not punishing anyone for having been arrested and is not enhancing any of the punishment here because of an arrest." (NYSCEF No. 585 at Tr. 80-81.) These distinctions make no difference. In Matter of Palacio, the sealed arrest-related information was provided to a distinct third party—the State Division of Parole, a separate agency, at a different level of government, carrying out different functions, from the New York County District Attorney's Office. Additionally, although both the sender and recipient of the letter in Matter of Palacio were in some sense in "the government" writ large, nothing in the First Department's analysis turned on whether the document containing the sealed arrest information had been generated (or used) by public or private entities. Further, as discussed in Subsection II.B.1, supra, this court holds that CPL 160.50 and 160.60 bind private entities, as well as governmental ones. And as discussed in Subsection II.B.4, infra, this court holds that the applicability of §§ 160.50 and 160.60 is not limited to scenarios in which the applicability of a disciplinary rule to a person's conduct, or the severity of a disciplinary sanction for that conduct, turn on whether the person was arrested.

Footnote 31:The Second Department's affirmance of the motion-court ruling in Matter of Young does not discuss the § 160.50 issue—only whether the challenged firing of the probationary officer in that proceeding was in bad faith. (See 221 AD3d at 722).

Footnote 32:The holding in Matter of Thygesen about the arresting officer's testimony is not relevant to the issues in this proceeding. That holding reflects the noncontroversial proposition that if the NYPD or Columbia Public Safety officers had testified from memory at the UJB hearings about petitioners' being present in Hamilton Hall, that testimony would have been properly admitted. (See e.g. Matter of Rosa v New York City Hous. Auth., Straus Houses, 160 AD3d 499, 499 [1st Dept 2018] [reaching this conclusion].) But no police officer testified at the UJB hearings, whether from memory or otherwise.

Footnote 33:This court is unpersuaded by respondent's suggestion that this proceeding is indistinguishable from Matter of Thygesen. Respondent asserts that both cases involve reliance on "a record created by a private third party based on then-unsealed information from law enforcement." (NYSCEF No. 592 at 5.) But in Thygesen, the information from now-sealed records was provided by law enforcement to media outlets, and was then relied on by a volunteer fire company that had no connection to the media. Here, the information from now-sealed records was provided by law enforcement to a Columbia entity (the Department of Public Safety) and was then relied on by another Columbia entity (the UJB). The connection between law enforcement's dissemination of information from now-sealed (and thus the sealed records) and the later use of that information is meaningfully tighter in this proceeding than in Matter of Thygesen.

Footnote 34:The Second Department's decision affirming the motion court in Matter of Young would be binding here (absent a conflict with First Department precedent); but as discussed in note 31, supra, the Second Department's affirmance did not discuss issues relating to CPL 160.50.

Footnote 35:Respondent asserts that there was more evidence of petitioners' underlying wrongful conduct than in Matter of Young, because the record before the UJB "contained ample (and unrebutted) materials with no connection whatsoever to law enforcement," such as "photographs of extensive property damage, clips of CCTV camera footage from inside Hamilton Hall during the occupation . . . and media coverage." (NYSCEF No. 296 at 8-9.) But those materials concededly do not show any wrongful conduct by petitioners, in particular. (See NYSCEF No. 612 at Tr. 4, 6.)

Footnote 36:Matter of Young is also distinguishable on another ground. In that case, the records the City had reviewed prior to the favorable termination of the petitioner's criminal prosecution included evidence of petitioner's wrongful conduct that would not constitute official records subject to sealing, such as a recording of a 911 call by petitioner that had included false statements. (See Matter of Young, 68 Misc 3d at 515-516 [describing materials reviewed]; Matter of Dockery, 51 AD3d at 575 [holding that 911 recordings are not official records for sealing purposes].) In this case the challenged evidence in the UJB proceedings against petitioners reflected only that they had been arrested. And information that a person has been arrested is subject to sealing upon the later favorable termination of that person's prosecution. (See Matter of Palacio, 13 AD3d at 282.)

Footnote 37:Had respondent asked petitioners at their UJB hearings whether they had been arrested in Hamilton Hall on the night in question, purely to establish petitioners' presence there, petitioners would have been entitled under CPL 160.60 to deny the fact of the arrest. (See CPL 160.60 [providing that except where specifically required by statute or court order, "no such person shall be required to divulge information pertaining to the arrest or prosecution"]; People v Ellis, 184 AD2d 307, 308 [1st Dept 1992] [holding that a trial witness who has secured a favorable termination of criminal charges may properly testify under oath that he was not arrested in the first place].) For clarity, this statute-based entitlement to deny that an arrest had occurred is distinct from, and independent of, petitioners' right under the Columbia Rules to decline altogether on self-incrimination grounds to answer the question whether they had been arrested in Hamilton Hall. (See NYSCEF No. 568 at 9 [Rule 446] ["[T]he respondent [may] . . . refrain from making self-incriminating statements."].)

Footnote 38:The question whether placing petitioners within the set of people present in Hamilton Hall is not only necessary, but also sufficient, to support the UJB's disciplinary determinations against petitioners is addressed in Point III, infra.

Footnote 39:This court is therefore unpersuaded by respondent's contention that petitioners have failed to "show that the UJB committed an error of law" within the meaning of CPLR article 7803. (NYSCEF No. 592 at 7.)

Footnote 40:As noted above (see note 3, supra) respondent has since substantially changed the disciplinary process for alleged violations of the Rules of University Conduct. Those amendments do not affect the sufficiency challenge considered in Point III.

Footnote 41:In defending some of the disciplinary sanctions imposed on petitioners, respondent argues that those sanctions are permissible because they fall within the scope of the applicable Rule and are "expressly contemplate[d]" by the Guidelines. (NYSCEF No. 566 at 31.)

Footnote 42:The UJB's determinations on this issue were affirmed on administrative appeal by respondent's Appeals Board. But in rejecting petitioners' appeals, the Appeals Board held only that the UJB's conclusions were reasonable—and therefore not an appealable procedural error—without providing independent analysis of the issue. (See e.g. NYSCEF No. 320 at 5.) This court's discussion therefore focuses on the UJB's explanation of its first-level determinations.

Footnote 43:As noted in Section I.B of the Background, supra, the charges brought by respondent, the UJB's determinations whether petitioners were or were not responsible for each of the charged violations, and the reasoning given to explain those determinations are essentially identical—in both substance and language—for each petitioner. Rather than go petitioner-by-petitioner, this court's analysis of petitioners' sufficiency challenge is based on the UJB's analysis and determinations in resolving J. Doe 1's proceeding, treating that proceeding as representative of the rest.

Footnote 44:Conversely, the UJB found that petitioners were not responsible for violating Rules 443 (10) and (11), which proscribe unauthorized entry into, or occupation of, private offices. (See NYSCEF No. 318 at 6.) But in considering these charges, the UJB had before it the same evidence of petitioners' conduct as with other charges—i.e., that petitioners were present in Hamilton Hall while it was occupied. The only difference was that the UJB lacked evidence of whether the group of occupiers entered private offices in Hamilton. The UJB's different ruling with respect to these charges underscores that on several of the charges, the UJB was basing its responsibility determinations on the actions of other members of the group, not on petitioners' own individual conduct. Although that might be permissible in a criminal prosecution that includes a conspiracy charge—assuming each petitioner was found to be a member of the relevant conspiracy—the Rules undisputedly do not provide for conspiracy-based responsibility for disciplinary violations.

Footnote 45:This court is not persuaded by petitioners' contention that the UJB had impermissibly shifted the burden of proof to them by noting that petitioners had not provided evidence that might rebut respondent's submissions. (See NYSCEF No. 578 at 34.) In context, the challenged language from the UJB determinations reflects merely the commonplace notion that if a party introduces evidence on a given issue, rebutting that evidentiary showing will frequently entail submitting countervailing evidence. (See NYSCEF No. 318 at 3.) The UJB did not, as petitioners suggest, require petitioners to prove their innocence of the charged violations.

Footnote 46:The descriptions in this section of the charged violations are drawn from the language of the Rules as they appear in NYSCEF No. 568 at 6.

Footnote 47:As noted at the beginning of Point IV, the court's analysis in Section IV.B takes as given that the (sealed) arrest-related evidence before the UJB was admissible.

Footnote 48:It is permissible to use "the same body of evidence . . . to prove two different violations." (Matter of Karakash v Del Valle, 194 AD3d 54, 62 [1st Dept 2021].) But here, not only the evidence but also the nature of the violation in Charges 5 and 10 is the same. That is impermissibly duplicative.

Footnote 49:Although the parties sought and were afforded the opportunity to submit post-argument letter briefs (see NYSCEF Nos. 592, 609, 611), petitioners' letter does not identify authority that might support the court's directing respondent to employ now-abrogated disciplinary procedures on remand.